Argued and submitted June 29, affirmed December 26, 2001

# STATE OF OREGON,
*Respondent,*

*v.*

# JUSTIN DAVID HANNAFORD,
*Appellant.*

## 98CR0378FE; A108453

37 P3d 200

Steven V. Humber, Deputy Public Defender, argued the cause for appellant. With him on the brief was David E. Groom, Public Defender.

Doug M. Petrina, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Deits, Chief Judge,* and Armstrong, Judge.

EDMONDS, P. J.

Armstrong, J., dissenting.

---

* Deits, C. J., *vice* Warren, S. J.

## EDMONDS, P. J.

Defendant appeals from judgments of conviction for one count of delivery of a controlled substance and two counts of possession of a controlled substance. ORS 475.992. He assigns error to the denial of his motion to suppress the evidence of controlled substances that form the basis of his convictions, on the ground that the officer who searched his car did not have a reasonable suspicion that he posed an immediate threat of physical injury to the officer. We affirm.

■      The trial court made findings of fact in its memorandum opinion. We are bound by those findings if they are supported by the evidence. If findings are not made on all the factual issues, we will presume that the facts are consistent with the trial court's ultimate conclusion. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968).

Defendant was a passenger in a car that was being driven on Interstate 5 with its headlight beams on high, shortly after midnight. Officer Plummer, after following the car for a while, pulled up behind it without turning on his lights or siren. The driver of the car then pulled off the road, and Plummer stopped his vehicle and approached the car. After being confronted about driving with high beams, the driver disclosed to Plummer that he did not have a current license to drive and that the vehicle was not his. He indicated that the car belonged to the passenger, defendant. When asked about his ownership, defendant provided vague and evasive responses, stating that he had recently bought it from someone named Buck. Defendant said that he could not remember Buck's last name. He was unable to furnish any vehicle registration papers in his name or proof of insurance to the officer.

Defendant was noticeably nervous during his conversation with Plummer. During the conversation with defendant, Plummer formed the belief that the car might be stolen, and he returned to his vehicle where he checked on the status of the car and on the driver and defendant. He learned that the driver had a suspended license, that there were outstanding warrants for his arrest, and that defendant

was on probation for attempted unauthorized use and unauthorized entry of a motor vehicle. Plummer asked that the dispatcher contact the registered owner of the car, whose name he had ascertained from outdated information from the glove box of the car that defendant gave him. He also called for backup from other officers, who arrived on the scene quickly.

After the back-up officers arrived, Plummer walked back to the vehicle where defendant was still sitting in the right front passenger seat. He noted that, throughout the time that he had been checking on the car's status, defendant had been moving his head and body from side to side as if dancing to music. However, Plummer heard no music playing in the car when he returned to it. Plummer had the driver get out of the car and go back to where the other officers were. Because of the outstanding warrants, the driver was arrested.

Defendant was not under arrest and remained in the car. Plummer approached the car and began to talk with defendant again. They talked first about the lack of proof of insurance for the car. Defendant reiterated that the car was newly purchased, and the officer asked whether defendant had proof of insurance on any other car. Defendant said that he thought he might have such proof, and Plummer asked to see it. Defendant then turned his body so that his back was completely toward Plummer and began to reach under the front seat of the vehicle, shielding both of his hands from Plummer's view. Plummer testified:

> "He wasn't reaching under the seat like he was grabbing something. He was reaching under the seat like he was pushing something, because every time he would thrust with his hand, he would go deeper and deeper under the seat. As he did that, I noticed there was a box being pushed out underneath the seat that ended up being behind the front seat on the floor."

The officer then told defendant that he was concerned about what defendant was doing, and defendant stopped thrusting with his hands. Defendant then immediately pulled out a day planner from under the seat, from a different location than where he had been thrusting with his hands. The officer saw

that, when defendant reached for the day planner, his hand "wasn't as deep as he had been with his hand when he was making the thrusting motions." Defendant then opened the day planner and found insurance information in it about another vehicle that he had owned.

Plummer asked defendant if he had any weapons in the car. Plummer testified:

"[B]ecause of his movements and reaching under the seat and stuff, I was kind of concerned that there might be. I still didn't know if the vehicle was stolen, wasn't stolen, and that movement of blading his body and reaching under there, making all the thrusting motions was pretty furtive in my opinion."

Defendant denied having a weapon in the car. Plummer then asked him about whether he had drugs that he might be trying to hide. At that time, according to Plummer,

"[defendant] became visibly nervous. His hands were trembling. His voice became shaky. His words were choppy and incomplete. I could see the pulse in his carotid artery along the right side of his neck pulsing. I could see that. Because of the obvious nervousness and the suspicion, the way he reached under the seat, the other suspicions I had about the vehicle, I asked [defendant]—well, I told [him] that I wanted to look under the seat he was sitting on and wanted to make sure there were no weapons in the vehicle."[1]

Plummer testified that, when he saw defendant turn his body and reach underneath the seat, he:

"First of all [ ] was concerned that perhaps there was a weapon and that it was—trying to be secreted, distance itself from whoever was, you know, I've seen that happen a lot, people trying to distance themselves from whatever is wrong. In addition to that—at that point that's what I thought. When I saw the box coming out, I wasn't sure, other than the officer safety issue, there might have been a weapon. Whatever it was, he was trying to get it away from him."

---

[1] The state does not contend that any consent was requested or given for the search that followed.

Plummer instructed defendant to get out of the vehicle, and defendant's hands began to tremble as he got out. After defendant was out of the car, Plummer could see on the center front seat that there was an armrest, folded down onto the front seat where defendant had been sitting. A small, clear plastic bag that contained dried marijuana protruded from under the armrest. Plummer picked up the bag, looked at the amount of marijuana, and determined that it was less than one ounce. He then frisked defendant and told him that he was going to look under the seat. He had defendant go back to where the other officers were located. Plummer then lifted the armrest where the marijuana had been found and saw another clear plastic bag containing methamphetamine. He looked under defendant's seat and found no weapons. He then reached behind the passenger seat and found the box that defendant had pushed into the back of the car. In the box were six ounces of marijuana and a marijuana pipe with marijuana residue on it. After those discoveries, Plummer arrested defendant for possession of a controlled substance.

Defendant argued to the trial court, in support of his motion:

"The police authorities searched an automobile without probable cause to believe that seizable items would be found in the automobile searched, without a warrant authorizing the search and without any exception to the warrant requirement of Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. All items seized and all information obtained therefrom should be suppressed."

The trial court denied the motion, stating:

"Defendant provided vague and evasive responses. Defendant said he bought the vehicle from some 'Buck.' [Defendant] was unable to present any current registration in his name. No insurance proof was provided. Plummer then did a radio check on [the driver] and Defendant. During this check, Plummer learned that Defendant was on probation for unauthorized use and unauthorized entry to a motor vehicle. Plummer had probable cause to believe that Defendant ha[d] committed the crime of unauthorized use of a motor vehicle. Therefore, Plummer walked back to the passenger side of the vehicle. Defendant completely bladed his

body so that his back was to Plummer, and immediately started reaching down under the front seat of the vehicle with his right hand. It appeared to Plummer that Defendant was pushing a box deeper and deeper under the seat. Defendant then produced a day planner. * * * Senior Trooper Plummer articulated a reasonable basis (on training and experience) why he felt a further search was appropriate. * * * Motion to suppress is denied."

Defendant then was convicted after a trial to the court.

On appeal, defendant argues that the trial court's rationale for its ruling, the officer safety exception to the warrant requirement, is not supported by the evidence. Specifically, he argues that Plummer did not have a reasonable suspicion based on specific and articulable facts that defendant posed an immediate threat of serious physical injury to Plummer. The state responds that defendant did not preserve the issue that he raises on appeal and that the officer was justified in looking under the seat based on the search incident to arrest, automobile, or officer safety exceptions to the warrant requirement of Article I, section 9, of the Oregon Constitution.

■■ We will assume without deciding that defendant's reference to the Article I, section 9, warrant requirement in this case preserves the issue of whether the officer's warrantless search was justified under the officer safety exception.[2] An officer is allowed to take

"reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present." *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987).

That exception expresses a policy in favor of allowing officers some discretion in determining their course of action, in light of the split-second decisions they often have to make during citizen encounters and the danger presented to them during such encounters. *Id.* at 523-24. When evaluating an officer's

---

[2] *But see State v. McNeely*, 330 Or 457, 468, 8 P3d 212, *cert den* 531 US 1055 (2000).

actions, this court inquires " 'whether the precautions taken [by the officer] were reasonable under the circumstances as they reasonably appeared at the time.' " *State v. Blevins*, 142 Or App 237, 242, 920 P2d 1131 (1996), *rev den* 327 Or 521 (1998) (quoting *Bates*, 304 Or at 525).

■■ Here, Plummer's testimony shows that the primary basis for his concern was defendant's body motions, which the officer believed appeared to be directed at hiding something under the vehicle's seat. Whether a gesture will give rise to a reasonable suspicion that a citizen poses an immediate threat of serious physical injury depends on the individual circumstances of each case. For instance, in *State v. Ehly*, 317 Or 66, 854 P2d 421 (1993), the defendant had been an occupant in a hotel room and had refused to leave or return the key after his period of occupancy ended. The hotel manager contacted the police for assistance in removing the defendant. The officers who responded asked the defendant to leave, and he began to do so. The defendant was "semi-coherent," "belligerent," and "nervous," and appeared to be under the influence of drugs. *Id*. at 68. As he was leaving, the officer asked him if he had the key to return to the manager. Defendant said that the key was probably in his bag, and he began to rummage around with both hands in the bag. The officers became concerned that the defendant was reaching for a weapon and asked him to empty the bag onto the bed to search for the key. The defendant ignored their request, so the officers told him to step away from the bag, emptied the bag themselves, and found a gun. In a second bag, they found controlled substances.

On review, the Supreme Court first determined that the defendant was not stopped or restrained from leaving when the officers first entered the room, and thus, no justification was required for the interaction between the officers and the defendant. *See State v. Warner*, 284 Or 147, 585 P2d 681 (1978). The court then turned to the defendant's argument that he had been seized when the officers asked him to find the key and to dump the bag on the bed. The court concluded that the officers had not seized defendant at that time because he was, in fact, free to leave. However, the court determined that the defendant was seized when the officer told him to remove his hands from the bag and to step back

from the bed. By that command, the officers had exercised control over his person. The court held that the seizure of the defendant's person was lawful because the police had probable cause to believe that he had committed a crime.

Nonetheless, the defendant argued that, even if the seizure of his person was lawful, the search of the bag was unlawful. The court ruled:

> "In addition to the specific and articulable facts set forth above that justified the officers in stopping defendant, the fact that defendant made no response to Officer Emerson's suggestion that he simply dump the bag's contents on the bed, but continued rummaging through the gym bag with both his hands concealed, created a reasonable suspicion in the officers' minds that defendant was reaching for a gun and therefore was presently dangerous to them[.]" *Ehly,* 317 Or at 82.

The court clarified that its inquiry was, " 'whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the decision was made.' " *Id.,* at 82-83 (quoting *Bates,* 304 Or at 525). It held that, "the totality of the circumstances justified the officers' reasonable suspicion that there was a gun in the gym bag and that their safety * * * would be at risk if they returned the gym bag to defendant unexamined." *Ehly,* 317 Or at 83.

In contrast to the holding in *Ehly,* the court in *Bates* held that the gesture in that case was insufficient to establish justification for a search for personal safety. *Bates,* 304 Or at 519. In *Bates,* the defendant was stopped for excessive vehicle emissions. His car had out-of-state license plates, and his driver's license was also from another state. The neighborhood where he was stopped was described as a high-crime residential area. During the stop, an officer saw a portion of a bag sticking out from underneath the defendant's seat and commented about it to the defendant. He asked the defendant to reach down and to pull the bag cautiously out from between his feet, so that the officer could see it. The defendant instead reached under the seat and kept his hands in that position for about ten seconds, although the officer repeated his request several times. The officer then pulled

his weapon, ordered the defendant out of the car, seized and searched the bag, and found ammunition and drugs in it.

■     In evaluating the validity of the seizure, the court first held that the officer had exceeded the scope of the traffic stop by requiring the defendant to reach down and produce the bag for inspection. The court then turned to the question of whether the search was justified by concerns for the officer's safety. The court said:

> "Without any indication that the sack either was a weapon or contained one, the officers nonetheless sought to determine its contents. Defendant did not comply, and the rest is history. This case then comes down to this: May officers, in the course of a necessarily brief encounter with a driver for the purpose of issuing a traffic citation for a Class D traffic infraction and without having any specific and articulable facts justifying their apprehension, constitutionally require the driver to remove and open a bag from beneath the driver's seat of the car?
>
> "Without more facts than those adduced at the hearing, we think the answer under the Oregon Constitution, Article I, section 9, must be 'no.' Although the police are entitled to some leeway in taking protective measures, we must draw the line at some point. The facts articulated by [the officer] in this case fall short of creating a reasonable belief that this defendant posed an immediate threat. In light of defendant's cooperative attitude, his lack of aggressive or threatening behavior and the absence of any apparent weapon, the mere possibility that he might have committed a crime and the presence of what appeared to be a bag are not sufficient." *Bates*, 304 Or at 526-27.

What those cases illustrate is that the validity of a search for the safety of an officer will depend on whether the facts articulated by the officer show a subjective suspicion and also meet an objective standard of a reasonable suspicion, that the citizen poses an immediate threat of physical harm to the officer or others. Here, the critical facts are that defendant was a passenger in a car in which the driver had a suspended license and there were outstanding warrants for the driver's arrest. Defendant claimed ownership of the car but was unable to produce any documentation showing such ownership. He was on probation for other crimes related to

stolen cars. When he was asked to find evidence of insurance, he completely turned his back to the officer in an unusual way and concealed his hands from view. He began to thrust something further and further underneath the seat to the extent that a box became visible on the floor in the backseat. The box was large enough to contain a gun. All of those actions occurred in response to a question about insurance papers. When the officer told defendant of his concern about defendant's actions, defendant immediately produced the requested documentation from a different area under the seat from where his hands had been concealed. Based on those facts, the officer undertook a search for his own safety.

We conclude that those facts are sufficient to create a reasonable suspicion that the officer's safety was in immediate jeopardy. The officer suspected that he was dealing with a stolen car, and he knew that defendant was on probation for attempted unauthorized use of a motor vehicle and unauthorized entry into a motor vehicle when the officer returned to the car. Defendant's actions with his body and his hands were consistent with conduct that appeared to hide something. Based on the size of the box that emerged from under the seat, Plummer could reasonably believe that it contained a weapon or that there was a weapon under the seat. Finally, defendant readily produced the insurance papers from a different area under the seat. Those circumstances make this case more like the circumstances in *Ehly* than in *Bates*. We conclude that under Article I, section 9, they justify Plummer's entry into the car to find out whether there was a weapon under the seat.

The dissent focuses on several facts to the exclusion of others to support its disagreement with our conclusion. First, it says that "[i]t is unreasonable to assume that someone is dangerous simply because he or she is on probation for a nonviolent crime and is suspected of having committed a similar, nonviolent crime." 178 Or App at 464 (Armstrong, J., dissenting). To the contrary, we believe it to be a potentially more dangerous situation when an officer confronts a probationer who appears to be in violation of his probation for having committed a new crime than when encountering an ordinary citizen. We are aware of no commonly understood principle of human behavior that suggests that an offender

with a nonviolent history is less apt than an offender with a history of violence to escalate his behavior to effectuate an escape from police custody.

Second, the dissent asserts that "defendant was not attempting to retrieve something but, rather, to push it away." 178 Or App at 464 (Armstrong, J., dissenting). The dissent takes the officer's testimony out of its context. The officer testified that he observed defendant moving his head and body from side to side while sitting in the car. When the officer asked defendant for his insurance papers, defendant shielded his body in such a way that the officer could not see defendant's hands, and he began pushing at something under the seat and out of the view of the officer. A box capable of containing a weapon appeared from behind the seat as defendant continued to thrust his hands under the seat. The officer observed defendant reach into a different area to retrieve the insurance papers after defendant was informed about the officer's concern regarding the thrusting motion. Also, defendant was visibly nervous, and his carotid artery was pulsating. Defendant's thrusting actions while he remained in the car and not under arrest are susceptible to two remaining reasonable explanations: either he was trying to further hide contraband that was already hidden from view under the seat, or he was attempting to gain access to, or further hide, a weapon that could be used to facilitate an escape. Because defendant remained in the car, his attempt either to gain access to a weapon *or* to strategically hide a weapon would be a threat to the officer's safety. Under such circumstances, the officer can scarcely be expected to turn his back simply because the suspect has not yet gained access to the weapon. In light of those alternatives, this court will not second-guess the officer's need to assure his safety.

Affirmed.

**ARMSTRONG, J.,** dissenting.

The majority concludes that Plummer reasonably suspected that defendant might pose an immediate threat to Plummer's safety. It therefore concludes that Plummer acted lawfully when he conducted a warrantless search of a box in

defendant's car to determine if it contained a weapon. I disagree with those conclusions and, as a consequence, dissent from the majority's decision to uphold the search.

To justify a warrantless search of a person or his property under the officer-safety exception to the warrant requirement, an officer must have a reasonable suspicion, "based upon specific and articulable facts, that the [person] might pose an *immediate threat of serious physical injury* to the officer or to others then present." *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987) (emphasis added). Although fact matching in this area of law can be a fool's errand, I nevertheless believe that the cases that have applied the officer-safety exception provide perspective on whether defendant's conduct caused Plummer reasonably to believe that defendant posed an immediate threat to him.

In *State v. Knox*, 134 Or App 154, 894 P2d 1185 (1995), *vac'd on other grounds* 327 Or 97, a police officer stopped the defendant for a minor traffic infraction. Before the officer signalled the defendant to pull over, the defendant reached toward the passenger seat with his right hand. The officer, Sharpton, believed that that movement might indicate an attempt by the defendant to conceal something. After the defendant stopped his pickup, he got out of it and met Sharpton near the back of it. Sharpton recognized the defendant and remembered that the defendant had been a suspect in several crimes, including a homicide, and had a reputation for carrying weapons. The defendant had also been carrying weapons the last two times Sharpton had stopped him. After other officers arrived, Sharpton searched the defendant's pickup because he was "worried that defendant might have access to weapons in the interior [of the pickup] by reaching through the window." *Knox*, 134 Or App at 157. We held that the search did not come within the officer-safety exception because neither the defendant's past involvement in criminal investigations nor his reputation for carrying weapons created a reasonable suspicion that he might pose an immediate threat to Sharpton. *Id.* at 159-60.

Here, the state argues that the circumstances of the stop led Plummer reasonably to believe that defendant might

pose an immediate threat to him. However, I am not persuaded that the facts that Plummer articulated created a reasonable suspicion that defendant might have posed such a threat.

First, the circumstances surrounding the stop provide little evidence to support a concern for officer safety. Defendant was on probation for unauthorized entry and attempted unauthorized use of a motor vehicle. Although Plummer may have suspected that the car in which defendant was riding was stolen, Plummer had not received a report about the status of the car when he questioned defendant about the insurance for it. Moreover, there is nothing inherently threatening about defendant's status as a person on probation for nonviolent crimes. In *Knox*, we rejected an officer-safety search despite the fact that the defendant had been a suspect in several crimes, including a homicide, and the officer's first-hand knowledge that the defendant oftentimes carried weapons. *Knox*, 134 Or App at 159-60. It is unreasonable to assume that someone is dangerous simply because he or she is on probation for a nonviolent crime and is suspected of having committed a similar, nonviolent crime. Consequently, unlike the majority, I am not persuaded that the circumstances surrounding the stop support a finding that Plummer's safety might have been in immediate jeopardy.

Defendant's conduct further rebuts the state's contention that Plummer had a reasonable belief that defendant might pose an immediate threat to him. Plummer testified that both defendant and the driver were cooperative at all times. There was no evidence that defendant ever threatened or acted aggressively toward Plummer. The only furtive movements by defendant occurred while he was searching for his insurance information. Defendant immediately stopped that conduct, however, when Plummer told him that his actions were making Plummer nervous. Additionally, defendant's actions were not objectively threatening. Plummer testified that defendant was not attempting to retrieve something but, rather, to push it away: "Whatever it was, he was trying to get it away from him."

The majority sees the situation differently. In its view, defendant's actions regarding the box could be interpreted to represent either an attempt to push the box away or an inept effort to open the box to retrieve a weapon to use against Plummer and the other officers. 178 Or App at 462. The problem with the latter interpretation is that it cannot be reconciled with Plummer's testimony about what he observed. The officer-safety exception requires us to focus on the specific facts that *Plummer* articulated that caused *him* to be concerned for his safety. Plummer consistently testified that he perceived defendant to be trying to push something away from himself. In addition to the statement quoted above, in which Plummer testified that "[w]hatever it was, [defendant] was trying to get it away from him," Plummer also said that defendant

> "wasn't reaching under the seat like he was grabbing something. He was reaching under the seat like he was pushing something because every time he would thrust with his hand he would go deeper and deeper under the seat."

The majority ignores that testimony to create a concern that Plummer did not articulate or have, that is, that defendant was reaching under the seat to grab a weapon. The officer-safety exception does not work that way.

The majority also fails to keep defendant's nervousness in context and thereby makes it appear to be more a cause for concern than it was. Defendant became nervous only *after* Plummer asked him if "he had any drugs in the vehicle that he might be trying to hide." Significantly, defendant did not appear to be nervous while pushing at the box under the seat, retrieving the insurance information, or responding to a question about whether he had a weapon under the seat. Plummer testified:

> "A.   I asked him if he had any weapons under the seat he was sitting on. He told me he didn't. I asked him if he had any drugs in the vehicle that he might be trying to hide from me. At that time [defendant] became visibly nervous. His hands were trembling. His voice became shaky. His words were choppy and incomplete. I could see the pulse in his carotid artery along the right side of his neck pulsing. I could see that. * * *.

"Q.   Let me stop you there. Prior to that time, had he been that nervous?

"A.   No.

"Q.   Was there a marked change in the degree of his nervousness when you asked about the drugs?

"A.   Yes, there was."

When viewed in context and as described by Plummer, defendant's actions were not the type of furtive actions that could give rise to a reasonable belief that defendant might pose an immediate threat of serious physical injury to Plummer and the other officers.

A comparison of this case with *Bates* confirms that conclusion. In *Bates*, an officer ordered the defendant to pull a paper bag out from under a car seat. Instead of doing that, the defendant reached under the seat and kept his hands in that position despite repeated commands by the officer to pull the bag out. Despite the fact that a handgun was found underneath the seat, the Supreme Court concluded that,

"[a]lthough the police are entitled to some leeway in taking protective measures, we must draw the line at some point. The facts articulated by [the officer] in this case fall short of creating a reasonable belief that this defendant posed an immediate threat. In light of defendant's cooperative attitude, his lack of aggressive or threatening behavior and the absence of any apparent weapon, the mere possibility that he might have committed a crime and the presence of what appeared to be a bag are not sufficient." *Bates*, 304 Or at 527.

Here, defendant was cooperative and did not engage in any aggressive or threatening behavior. No weapons were apparent, and the mere possibility that defendant might have stolen the car and that he sought to push a box farther under his seat did not create a reasonable belief that he might pose an immediate threat to Plummer. If anything, the facts in *Bates* provided more support for the existence of a threat to the officer's safety than do the facts in this case. There, the defendant reached under a seat and left his hands in that position despite repeated commands by the officer to do otherwise. Here, defendant turned his back and began

pushing something away from himself, and, when the officer told defendant that his actions were making him nervous, defendant immediately stopped the objectionable conduct.[1] It seems clear that the actions of the defendant in *Bates* were more furtive and more likely to create a reasonable belief that he posed an immediate threat to the officer than were the actions of defendant in this case.

Because the warrantless search by Plummer does not come within the officer-safety exception to the warrant requirement or any other exception to that requirement, I respectfully dissent from the majority's decision to uphold the search.[2]

---

[1] In fact, defendant's actions could reasonably appear to be only what they were: an effort to hide a box that contained drugs. That conclusion is bolstered by the fact that Plummer began his search by lifting the armrest in the car to look for drugs before he retrieved and opened the box.

[2] The state argues that the search of the box was authorized under both the automobile and the search-incident-to-arrest exceptions to the warrant requirement. However, each exception requires the existence of probable cause to conduct a search. Here, Plummer found a plastic bag that contained less than an ounce of marijuana. A person cannot be arrested for possession of that amount of marijuana. *See State v. Tallman*, 76 Or App 715, 712 P2d 116 (1985). Although Plummer's discovery of methamphetamine did create probable cause to arrest defendant, Plummer discovered the methamphetamine by conducting an unlawful search. Plummer had authority to retrieve the small bag of marijuana, but he did not need to lift the armrest to do that. Hence, Plummer exceeded his authority when he lifted the armrest and found the methamphetamine. In light of what Plummer lawfully knew, he lacked probable cause to search the car or the box for evidence of a crime.