Submitted November 26, 2013, affirmed July 23, 2014

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

RONALD EUGENE LEE,
*Defendant-Appellant.*

Marion County Circuit Court
11C51568; A151603

332 P3d 894

Peter Gartlan, Chief Defender, and Elizabeth Daily, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Rolf C. Moan, Assistant Attorney General, filed the brief for respondent.

Before Ortega, Presiding Judge, and Sercombe, Judge, and Hadlock, Judge.

SERCOMBE, J.

**SERCOMBE, J.**

Defendant appeals a judgment convicting him of unlawful possession of methamphetamine, ORS 475.894, and felon in possession of a restricted weapon, ORS 166.270(2). On appeal, he asserts that the trial court erred in denying his motion to suppress. For the reasons explained below, we affirm.

We review a trial court's ruling on a motion to suppress for legal error, and state the facts consistently with the trial court's express and implied findings. *See State v. Hall,* 339 Or 7, 10, 115 P3d 908 (2005) (a reviewing court is bound by the trial court's factual findings if there is supporting evidence in the record and, in the absence of express findings, presumes the trial court found the facts consistently with its ultimate conclusion).

On the evening of December 7, 2011, Hickam, a deputy with the Marion County Sheriff's Office, was on patrol when he observed a Honda CR-V make a left turn without signaling. Hickam activated the overhead lights on his patrol car, and the Honda stopped in front of a residence (which turned out to be defendant's). Defendant was the front seat passenger in the vehicle, which was driven by Reinwold and also contained a backseat passenger, McElroy.

As Hickam approached the vehicle, "everybody in the car started moving around" and he observed McElroy "reaching to his side." That movement in the vehicle made Hickam—who had, on a prior occasion, been involved in a traffic stop where the backseat passenger attempted to shoot him—concerned about his safety. Accordingly, when he reached the vehicle, Hickam instructed its occupants to keep their hands where he could see them. After they complied, Hickam asked the driver for his license, vehicle registration, and insurance information, and, once he had received those items, he wrote down the information and returned them to the driver. Hickam then returned to his patrol car and, because of his safety concerns, immediately called for a second unit. Then, while sitting in his patrol car with the driver's door open, Hickam began to run the driver's information. As he did so, he observed McElroy moving

around in the vehicle again and defendant "reaching onto the floorboard of the car." The men appeared to the officer to be "putting something in their pants or getting rid of something." In the deputy's experience, that type of behavior had sometimes correlated with the presence of weapons. Although the traffic stop was not yet complete—the deputy had learned that the driver's license was valid but had not yet run the insurance information—Hickam determined that he could not safely write the citation at that point in light of the continued movement in the Honda.

A second deputy arrived almost immediately (approximately three minutes into the stop and one minute after Hickam called for a second unit) and, with that deputy present, Hickam returned to the Honda to follow up on his safety concerns. Hickam first asked McElroy whether he had any drugs, weapons, or anything illegal. After McElroy said that he did not, Hickam asked whether "he'd be willing to step out and allow [Hickam] to check." After McElroy agreed, Hickam checked and found nothing on him. Hickam then went through the same procedure with the driver. After finding nothing on the driver, Hickam came around to defendant's side of the car and asked him the same question. Defendant, who was wearing a "Gypsy Joker" shirt associated with "an outlaw criminal biker gang in the Salem area" whose members are known to carry weapons and drugs, opened the door of the car and responded that he had a "couple [of] knives," and, on the floorboard, Hickam observed a shotgun barrel. The deputy asked defendant if he would "be willing to step out and allow [the officer] to check," and defendant agreed that he would. In the front pocket of defendant's pants, Hickam found a knife with a four-inch blade that opened with centrifugal force. Because he knew defendant from prior encounters, Hickam was aware that defendant was a convicted felon and was not permitted to possess that type of knife. Accordingly, he arrested defendant and placed him in the patrol car.

Hickam then obtained the driver's consent to search the Honda and, during that search, found a hypodermic needle in the backseat and, near where defendant had been sitting, a pipe containing a substance that field tested positive

for methamphetamine. After Hickam read defendant his *Miranda* rights, defendant said that he had smoked methamphetamine about three hours earlier and that he had found the knife on the road, opened it, and knew that he could not legally possess it.

Defendant was charged with possession of methamphetamine and felon in possession of a restricted weapon. Before trial, he filed a motion to suppress "evidence seized as the result of" what he asserted was "an illegal search of [d]efendant and the vehicle in which defendant was a passenger on December 7, 2011." In particular, defendant asserted that the deputy did not have reasonable suspicion but nonetheless expanded the stop past the traffic infraction when he returned to the Honda and asked about weapons and drugs. In defendant's view, "that's the point where the constitutional violation occur[red]." The state asserted that the deputy's actions were justified by his reasonable safety concerns. The court ultimately denied defendant's motion, concluding:

> "Based on the evidence here and the law as I've understood it, at the time of the request for consent to search, the traffic stop was lawful. The deputy * * * had observed an infraction and was properly in the process of issuing a citation, taking due precaution for his own and also his fellow [deputy's] safety. I also find that the request for consent was a lawful part of that lawful stop based on the officer safety concerns."

As noted, on appeal, defendant asserts that the court erred in denying his motion to suppress.[1] He argues that Hickam "had seized defendant in a constitutional sense when he requested consent to search." And, in defendant's view, the seizure was unlawful because it was not supported

---

[1] In particular, defendant raises four assignments of error, each of which addresses evidence that, in his view, should have been suppressed: His first assignment relates to "his admission that he had 'a couple of knives'"; his second, the knife; his third, the methamphetamine pipe; and his fourth, his post-*Miranda* admissions. The state contends that, because defendant's motion asked for suppression of "evidence seized" as a result of the search of defendant and the vehicle, defendant failed to preserve any arguments relating to his statements either before the search or after he was given *Miranda* warnings. Because we conclude that, in any event, the court did not err in denying defendant's motion, we need not address the question whether defendant's first and fourth assignments were preserved.

by reasonable suspicion of a crime or a valid officer safety concern. The state, for its part, "does not dispute that Officer Hickam," by asking whether defendant possessed drugs, weapons, or anything illegal, "effected a 'seizure' for state constitutional purposes." However, according to the state, the seizure was lawful. The state asserts, in part, that reasonable officer safety concerns justified the seizure. We agree with the state that, under the circumstances here, the deputy's actions were justified by his reasonable safety concerns and, therefore, the court did not err in denying the motion to suppress.

Under Article I, section 9, of the Oregon Constitution, individuals are guaranteed the right to be "secure in their persons *** against unreasonable search, or seizure." However, Article I, section 9, permits an officer to

> "take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present."

*State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987). As explained in *Bates*, "[a] police officer in the field frequently must make life-or-death decisions in a matter of seconds. There may be little or no time in which to weigh the magnitude of a potential safety risk against the intrusiveness of protective measures." *Id.* For that reason, officers "must be allowed considerable latitude" to take measures to protect their safety. *Id.*; *see also State v. Rudder*, 347 Or 14, 22, 217 P3d 1064 (2009) ("[P]olice officers must be allowed considerable latitude to take protective measures when they reasonably feel threatened." (Internal quotation marks omitted.)). It is not this court's "function to uncharitably second-guess an officer's judgment. *Bates*, 304 Or at 524. Therefore, our inquiry is limited to whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the decision was made." *Id.* at 524-25; *see State v. Foster*, 347 Or 1, 10, 217 P3d 168 (2009) (the court will not second guess reasonable decisions made by an officer under pressure). A determination of the legality of an officer-safety related search or seizure "depends largely on

the facts of each case." *State v. Ehly*, 317 Or 66, 74, 854 P2d 421 (1993).

Defendant asserts that his "movements in the car did not create reasonable suspicion to believe that he posed an immediate threat of serious physical injury to the officer." We disagree. It is correct that movements by occupants in a stopped car will not always give rise to a reasonable officer safety concern sufficient to justify a search or seizure. Thus, in *State v. Amell*, 230 Or App 336, 345, 215 P3d 910 (2009), we concluded that officer-safety concerns related to the defendant's movement in the vehicle—in particular "digging between the seat and center console of the car"—did not justify a search where the "defendant was cooperative at all times, did not show hostility, and made no suspicious movements during his interactions with the police officers." Similarly, in *State v. Peterson*, 143 Or App 505, 507, 923 P2d 1340 (1996), an officer stopped the defendant's vehicle and, as he approached, saw the defendant "moving around a great deal in the car." (Internal quotation marks omitted.) The movements in question appeared to be "directed toward the passenger seat area" where a jacket was placed. *Id.* Accordingly, the officer asked the defendant whether there were drugs or weapons in the car and, after being told that there were not, asked again and was told that the defendant had a knife. We concluded that those circumstances did not justify reasonable officer safety concerns.

In contrast, in *State v. Hannaford*, 178 Or App 451, 461, 37 P3d 200 (2001), we upheld a warrantless search of a vehicle based on officer safety:

> "When [defendant] was asked to find evidence of insurance, he completely turned his back to the officer in an unusual way and concealed his hands from view. He began to thrust something further and further underneath the seat to the extent that a box became visible on the floor in the backseat. The box was large enough to contain a gun. All of those actions occurred in response to a question about insurance papers. When the officer told defendant of his concern about defendant's actions, defendant immediately produced the requested documentation from a different area under the seat from where his hands had been concealed. Based on those facts, the officer undertook a search for his own safety."

Likewise, in *State v. Haney*, 158 Or App 53, 973 P2d 359 (1999), we upheld the warrantless search of the defendant's purse on officer safety grounds. There, during a traffic stop, "two passengers repeatedly reached under the [vehicle's] bench seat, making furtive movements that, in [the officer's] experience, indicated that weapons were possibly underneath the seat." *Id.* at 56. In addition, the vehicle contained "three suspects and [there were] three officers, it was night time, and two of the passengers in the truck had been reluctant to follow the officers' instructions." *Id.* Under those circumstances, we concluded that "it was reasonable for the officer to ask [the] defendant for consent to search her purse for weapons[.]" *Id.* at 57. The Supreme Court reached the same conclusion regarding a search of the defendant's purse in *State v. Morgan*, 348 Or 283, 230 P3d 928 (2010). The court explained:

> "[S]ome of defendant's actions, considered together, were sufficient to elevate [the officer's] reasonable sense of concern for his safety: Her sudden exit from the car was unexpected. Her swift change of demeanor from calm to visibly nervous for an unknown reason understandably surprised the officer. What tipped the scales, however, was *defendant's act of reaching into the purse.* [The officer] had already mentioned to defendant his concern about weapons. To thereafter permit defendant to reach into a capacious purse that readily could have concealed a weapon would have been folly."

*Id.* at 290 (emphasis in original); *see also State v. Amaya*, 336 Or 616, 633, 89 P3d 1163 (2004) (an officer's question about the contents of a bag that the defendant was attempting to conceal did not violate Article I, section 9, because it was based on a reasonable suspicion that the defendant posed an immediate threat). Thus, "suspicious movement, together with other conduct that provoke[s] alarm (disobedience of police instruction, conduct inconsistent with inquiry, reluctance to follow police instructions)," has been held to be sufficient to give rise to reasonable suspicion of an immediate threat. *Amell*, 230 Or App at 342.

Here, too, the circumstances, considered together, were sufficient to give rise to a reasonable suspicion of an immediate threat to officer safety. When Hickam approached

the vehicle, its occupants began moving around and he observed the backseat passenger "reaching to his side"; in his experience, those circumstances indicated the possibility of a weapon. Defendant was wearing a shirt associated with an area gang whose members were known to carry weapons and drugs, and the deputy knew defendant from prior encounters and knew that he was a convicted felon. Then, when Hickam went back to his vehicle to write the citation, although he had instructed all the occupants of the vehicle to keep their hands in sight, defendant and the backseat passenger again began moving around. Significantly, contrary to the deputy's instruction, defendant reached down to the floorboard of the vehicle, and the men appeared to be "putting something in their pants or getting rid of something." Finally, even after backup arrived, there were only two deputies, but three occupants of the vehicle. Under those circumstances, the deputy could reasonably suspect that defendant posed an immediate threat of physical injury to him and it was permissible, under Article I, section 9, for him to take reasonable steps to protect himself and the other deputy, including asking defendant about the presence of weapons and for consent to search. Accordingly, the trial court did not err in denying the motion to suppress.

Affirmed.