Argued and submitted September 16; conviction for unlawful delivery of methamphetamine reversed and remanded, otherwise affirmed December 7, 2016

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

WILLIAM ROY DAVIS,
*Defendant-Appellant.*

Douglas County Circuit Court
12CR2239FE; A158034

385 P3d 1253

Laura A. Frikert, Deputy Public Defender, argued the cause for appellant. With her on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Shannon T. Reel, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen

F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Shorr, Judge.

## SHORR, J.

Defendant appeals a judgment of conviction for unlawful delivery of methamphetamine, ORS 475.890. He assigns error to the denial of his motion to suppress evidence that the police discovered following a traffic stop. Defendant raises three main arguments: First, defendant argues that the officer lacked reasonable suspicion to extend the traffic stop to investigate suspected drug activity; second, defendant argues that the officer's patdown search of defendant was not justified by a reasonable concern for officer safety; and, third, defendant argues that the officer lacked probable cause to reach into defendant's pocket and remove a camera case, in which the officer ultimately found methamphetamine. Assuming without deciding that the officer had reasonable suspicion to extend the traffic stop, we conclude that he nonetheless lacked an objectively reasonable concern for officer safety, and the patdown of defendant was therefore unlawful. Our resolution of that question obviates the need to address defendant's other arguments and, as discussed below, we reverse his conviction and remand.

In reviewing a denial of a motion to suppress, "we are bound by the trial court's findings of historical fact that are supported by evidence in the record." *State v. Holdorf*, 355 Or 812, 814, 333 P3d 982 (2014). Where the court did not make findings and "there is evidence from which those facts could be decided more than one way, we will presume that the trial court found facts in a manner consistent with its ultimate conclusion." *Id.* We state the facts below in accordance with those standards.

Jewell, a trooper with the Oregon State Police, had just concluded a midmorning traffic stop when he saw defendant pull up to a nearby stop sign. Jewell noticed that defendant was not wearing a seatbelt and signaled for him to pull over. Defendant complied and, when Jewell approached defendant's truck, he noticed that defendant was "reaching down on the floorboard area," and defendant's left hand went between his legs where Jewell could not see it. Concerned because defendant's movements were not typical for a traffic stop, and because Jewell did not know what defendant was doing, Jewell asked defendant to keep his hands where

Jewell could see them. Defendant complied and did not reach toward the floorboard again. Defendant continued to cooperate throughout the remainder of the traffic stop. Defendant told Jewell that he was not carrying any identification, that he was not the registered owner of the vehicle, that he did not have insurance, and that his driver's license was suspended. Jewell asked defendant to write down his name, date of birth, and other information. Defendant did as instructed, and, as he wrote down his information, he told Jewell that he had just come from his girlfriend's house in a nearby neighborhood. Jewell recognized the neighborhood as a high-crime area associated with methamphetamine activity.

As Jewell spoke with defendant, he noticed that defendant was "extremely nervous," and, as he later testified, "nervous to the point where I thought he * * * was ready to run or fight at any point in time." Jewell testified that he believed defendant might "run or fight" based on defendant's overall nervousness and because defendant was "looking about as if looking for a place to run." Additionally, Jewell noticed that defendant had bloodshot eyes and was making fidgety movements, including "mov[ing] his hands and fingers almost nonstop" and continually "tak[ing] his sunglasses on and off his head." Jewell testified that he believed those movements were consistent with recent drug use, but that he did not believe that defendant was "impaired to a noticeable, perceptible degree" by any substance. Jewell also noticed "a bulge in both of [defendant's] jeans pockets." Jewell testified that he "asked what it was[,] in hopes that it would be [defendant's] wallet with his I.D." Defendant first told Jewell that, "in substance[,] he didn't know exactly what was in his pocket." When Jewell asked again a few minutes later, defendant told Jewell that he had cigarettes in his pocket.

About five minutes into the stop, another officer, Ledbetter, arrived with a drug detection dog. At that point, Jewell believed that he had reasonable suspicion to investigate defendant for possible drug activity. Ledbetter ran the information that defendant had written down while Jewell remained with defendant. Jewell asked defendant if he had

anything illegal on him or in his truck, which defendant denied. Jewell then asked for consent to search defendant and his truck, which defendant also denied. Ledbetter confirmed that defendant's license was suspended,[1] and Jewell began writing a citation while Ledbetter remained at the truck talking with defendant. During that conversation, Ledbetter also noticed that defendant seemed extremely nervous and showed signs consistent with methamphetamine use.

Jewell and Ledbetter briefly compared their observations and decided to get Ledbetter's drug detection dog. Ledbetter told defendant that he was going to walk his drug detection dog around defendant's truck to sniff for controlled substances. Jewell then told defendant to get out of the truck, defendant did as instructed, and Jewell patted him down. Jewell testified that, upon reaching defendant's left pocket, he "felt what initially felt like bindles, * * * small plastic packages of controlled substances, and it felt like a soft-sided kind of wallet or something like that that they were under." Jewell frisked defendant a second time, more thoroughly feeling defendant's left pocket again to confirm what he felt. Ledbetter then patted defendant down and manipulated defendant's pocket to feel what was inside. Ledbetter also believed that defendant had bindles of a controlled substance, and so Jewell removed what turned out to be a soft camera case from defendant's pocket. After the drug detection dog alerted to the camera case, Ledbetter opened it and found methamphetamine inside. Defendant was arrested and charged with unlawful possession of methamphetamine, ORS 475.894, and unlawful delivery of methamphetamine, ORS 475.890.[2]

Before trial, defendant moved to suppress evidence obtained as a result of the stop. Defendant argued, among other things, that Jewell unlawfully extended the traffic stop by initiating a drug investigation without reasonable suspicion; that Jewell's patdown of defendant was not

---

[1] Defendant's citation for driving while suspended was for a noncriminal violation.

[2] The unlawful possession of methamphetamine charge was dismissed in the judgment by agreement of the parties.

supported by a valid officer-safety concern; and that Jewell lacked probable cause or a valid officer-safety concern to remove the camera case from defendant's pocket.

As relevant to defendant's officer-safety argument, Jewell testified during the suppression hearing that his safety concern was based on the following factors: (1) As Jewell was approaching defendant's truck, defendant made a movement toward the floorboard and defendant's left hand went "between his legs where [Jewell] couldn't see it"; (2) defendant was extremely fidgety and had bloodshot eyes, which Jewell believed were signs of recent drug use but not current impairment; (3) defendant was extremely nervous and Jewell believed that defendant "was ready to run or fight at any point in time" and was "looking about as if looking for a place to run"; (4) there were bulges in defendant's pockets; (5) when asked, defendant initially said he did not know what was in his pockets; and (6) Jewell had decided to ask defendant to get out of his truck for the drug sniff, and Ledbetter was going to have his back turned while he walked the drug detection dog. On cross-examination, Jewell testified that defendant was cooperative and readily provided his name, address, and other information when asked. Jewell also testified that defendant did not take issue with being asked to step out of the truck for a patdown, despite having just denied consent for the same search.

The trial court denied defendant's motion to suppress, concluding that Jewell's extension of the traffic stop was supported by reasonable suspicion and that Jewell also had a reasonable concern for officer safety that justified both the extension of the traffic stop and the initial patdown. The trial court further concluded that, on the first patdown, Jewell developed probable cause to arrest defendant for suspicion of a drug crime, and the second and third patdowns were therefore supported by probable cause and alternatively justified as searches incident to arrest. On appeal, defendant contests those three conclusions. As noted, we conclude that Jewell's initial patdown search was not justified by a reasonable concern for officer safety, and we therefore do not need to address defendant's other arguments. Accordingly, our analysis focuses only on the officer-safety issue.

In reviewing the denial of a motion to suppress evidence based on an allegedly unconstitutional search or seizure, "[a] trial court's findings of historical fact are binding on appellate courts if there is constitutionally sufficient evidence in the record to support those findings." *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). On appeal, "[o]ur function is to decide whether the trial court applied legal principles correctly to those facts." *Id.* We review the denial of a defendant's motion to suppress for legal error. *Id.*

The "officer safety" doctrine is a recognized exception to the general rule that warrantless searches are *per se* unreasonable and therefore unlawful under Article I, section 9, of the Oregon Constitution.[3] *State v. Rudder*, 347 Or 14, 21, 217 P3d 1064 (2009). The officer-safety exception allows an officer to

> "take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present."

*State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987). For the officer-safety exception to apply,

> "(1) the officer's actions must have occurred during a lawful encounter; (2) the officer must have had a reasonable suspicion that the individual posed an immediate threat of serious physical injury; and (3) the steps the officer took to protect the officer or others must have been reasonable."

*State v. Rodriguez-Perez*, 262 Or App 206, 212, 325 P3d 39 (2014).

On appeal, the parties do not dispute whether Jewell subjectively was concerned for his safety. Rather, they dispute whether that belief was objectively reasonable.[4]

---

[3] Article I, section 9, guarantees individuals the right "to be secure in their persons * * * against unreasonable search, or seizure."

[4] As already noted, defendant asserts that Jewell lacked reasonable suspicion to extend the traffic stop. Defendant also argues that the patdown was therefore unlawful because Jewell's officer-safety concerns did not arise "during a lawful encounter." *Rodriguez-Perez*, 262 Or App at 212. Because we resolve this case on the "objectively reasonable" prong of the officer-safety analysis, we do not reach that argument.

Whether an officer's safety concern was objectively reasonable is determined in light of the totality of the circumstances as they appeared to the officer at the time of the search. *State v. Jackson*, 190 Or App 194, 199, 78 P3d 584 (2003), *rev den*, 337 Or 182 (2004). To be objectively reasonable, "the officer's safety concerns must be based on facts specific to the particular person searched, not on intuition or a generalized fear that the person may pose a threat to the officer's safety." *Id.* at 198.

Any officer-safety analysis must balance two interests: the individual's constitutional right to security in his or her person and an officer's right to take reasonable safety measures.

> "Although this court is sensitive to the dangers inherent in police work and to the difficulties inherent in officer safety decisions, that does not and cannot mean that we regard those concerns as having greater weight than the constitutional right of all persons—even those who have been stopped on suspicion of criminal activity—to be free of unreasonable searches and seizures. If that constitutional right is to retain any vitality in the context of police stops, police officers must understand that the officer safety doctrine does not excuse protective measures that are disproportionate to any threat that the officers reasonably perceive."

*Rudder*, 347 Or at 23.

The touchstone of our inquiry is whether Jewell had a reasonable suspicion that defendant "might pose an immediate threat of serious physical injury to the officer or to others then present." *Bates*, 304 Or at 524. Here, Jewell's concern arose primarily from defendant's initial furtive movement, his demeanor, the bulges in his pockets, his statement that he did not know what was in his pockets, and the situational concern arising from the officers' decision to walk the drug detection dog around defendant's truck. However, in light of defendant's cooperative and compliant attitude throughout the encounter, none of those factors—individually or in totality—objectively suggests that defendant posed an "immediate threat of serious physical injury." *Rodriguez-Perez*, 262 Or App at 212.

We start our analysis with defendant's furtive movement. Although defendant's initial movement toward the floorboard of his truck may have raised Jewell's subjective suspicion, it was not accompanied by other conduct that would give rise to an objectively reasonable concern for safety. In *State v. Lee*, 264 Or App 350, 355-57, 332 P3d 894 (2014), we examined the significance of furtive movements by vehicle occupants during traffic stops and their potential effect on an officer-safety analysis. We noted that suspicious movements have been held sufficient when accompanied by "other conduct that provoke[s] alarm," for example, "disobedience of police instruction, conduct inconsistent with inquiry, [and] reluctance to follow police instructions." *Id.* at 356 (first brackets in original; parentheses and internal quotation marks omitted). Applying that principle, we held in *Lee* that the defendant's furtive movements during a traffic stop, when considered in the totality of the circumstances, gave rise to a reasonable concern for officer safety. *Id.* at 357. There, as an officer approached a vehicle that he had stopped, "'everybody in the car started moving around,'" and a passenger made a movement consistent with reaching for a weapon. *Id.* at 351. During the stop, the officer noticed that the defendant, a passenger, was dressed in clothing associated with a gang known to carry weapons. *Id.* The officer told the occupants to keep their hands visible, and, after he returned to his patrol car, he saw the defendant continue to make furtive movements:

> "*Significantly, contrary to the deputy's instruction,* defendant reached down to the floorboard of the vehicle, and the men appeared to be 'putting something in their pants or getting rid of something.' Finally, even after backup arrived, there were only two deputies, but three occupants of the vehicle. Under those circumstances, the deputy could reasonably suspect that defendant posed an immediate threat of physical injury to him[.]"

*Id.* at 357 (emphasis added).

In *State v. Hannaford*, 178 Or App 451, 461, 37 P3d 200 (2001), we also found that a defendant's furtive movements gave rise to a reasonable officer-safety concern. There, the officer had pulled over a vehicle and, during the course of the stop, came to believe that the car was stolen

and learned that the defendant was on probation for "crimes related to stolen cars." *Id.* at 460-61. When the officer asked the defendant for his insurance paperwork, the defendant "completely turned his back to the officer in an unusual way and concealed his hands from view." *Id.* at 461. The defendant then "began to thrust something further and further underneath the seat" until a box large enough to contain a gun "became visible on the floor in the backseat." *Id.* We emphasized that "[a]ll of these actions occurred in response to a question about insurance papers[,]" and, "[w]hen the officer told defendant of his concern about defendant's actions, defendant immediately produced the requested documentation from a different area under the seat from where his hands had been concealed." *Id.*

Defendant's furtive movement here was not associated with "other conduct that provoke[s] alarm." *Lee,* 264 Or App at 356. Defendant briefly reached toward the floor of his truck but ceased immediately when Jewell arrived at the window and asked defendant to put his hands on the steering wheel. That is substantially different than the furtive movement in *Hannaford.* Jewell did not testify that defendant ever made a movement toward any suspicious or threatening objects in the truck. Although defendant had "bulges" in his pockets, Jewell testified that defendant was reaching "down on the floorboard area" and that his hand went "between his legs." Jewell did not testify that the initial furtive movement was in any way related to the bulges in defendant's pockets.

The facts of this case put it much more in line with cases where we have held furtive movements to be insufficient to give rise to a reasonable concern for officer safety. For example, in *State v. Peterson,* 143 Or App 505, 507, 923 P2d 1340 (1996), *rev den,* 327 Or 521 (1998), an officer approaching a vehicle in a traffic stop "saw defendant 'moving around a great deal in the car' and noticed that the movements seemed to be directed toward the passenger seat area" where there was a jacket. As the officer spoke with the defendant, he noticed that the defendant was "nervous and was stuttering," that his eyes were "'darting around,'" and that he appeared to be under the influence of controlled substances. *Id.* at 507, 509 n 3. The officer asked the defendant

whether he had any weapons or drugs in the car, and the defendant said no. *Id.* at 508. When the officer asked a second time, the defendant admitted to having a knife in his boot. *Id.* The officer frisked the defendant, discovering drug paraphernalia in his pocket, and, in a subsequent search of the car, the officer found a loaded revolver under the jacket in the passenger seat and a sawed-off shotgun in the trunk. *Id.*

On appeal, we held that those circumstances did not support a reasonable officer-safety concern. *Id.* at 510. Despite the defendant's initial movement toward the jacket, "[n]o weapons were visible and defendant did not make any movements towards the jacket in [the officer's] presence, as if to retrieve a weapon for immediate use." *Id.* at 510-11. Rather, the officer "testified that defendant was cooperative and nonconfrontational in providing his license and answering questions about the ownership of the car." *Id.* at 511. Despite the officer's belief that the defendant exhibited signs of recent drug use, "there was nothing in defendant's behavior to suggest imminent aggressiveness or hostility toward [the officer]." *Id.*

Defendant's furtive movements in this case are materially indistinguishable from those in *Peterson*. Like in *Peterson*, defendant "was cooperative and nonconfrontational in providing his license and answering questions about the ownership of the car." 143 Or App at 511. As in *Peterson*, no weapons were visible in defendant's truck, defendant did not make any furtive movements "in [the officer's] presence, as if to retrieve a weapon for immediate use," and "there was nothing in defendant's behavior to suggest imminent aggressiveness or hostility toward [the officer]." *Id.*; *see State v. Senn*, 145 Or App 538, 545, 930 P2d 874 (1996) (defendant's movement of "his upper torso towards the floor board" of a vehicle during traffic stop, in light of defendant's "entirely cooperative, nonhostile, and nonthreatening" demeanor during encounter, did not give rise to a valid officer-safety concern); *see also State v. Amell*, 230 Or App 336, 345, 215 P3d 910 (2009) (defendant's movements, including "reaching" and "digging" between the seat and center console of car during a traffic stop and "reaching down, to the point where the car was moving," did not justify an officer-safety search where the "defendant was cooperative at all times,

did not show hostility, and made no suspicious movements during his interactions with the police officers").

The state nevertheless argues that the facts of the present case are distinguishable because, unlike in *Peterson* and *Senn*, where "nothing in the defendants' behavior or demeanor suggested imminent aggressiveness or hostility toward the officer," defendant here "was extremely nervous, his carotid artery was visibly pulsating, his fingers were shaking, and the officer believed he was ready to fight or flee at any moment." Additionally, the state emphasizes that defendant had unknown bulges in his pockets and, when asked what was in his pocket, defendant initially said that he did not know. Lastly, the state notes that Jewell had asked defendant to step out of the truck so that Ledbetter's dog could sniff it for drugs, which further elevated Jewell's safety concern.

Those additional facts, however, do not support an objectively reasonable belief that defendant "might pose an immediate threat of serious physical injury to the officer or to others then present." *Bates*, 304 Or at 524.

First, as we discussed in *Peterson*, a defendant's nervousness alone is not enough to suggest aggressiveness or hostility toward an officer. 143 Or App at 507. Moreover, although Jewell testified that he subjectively believed that defendant was ready to "run or fight," the only objective fact that he testified to in support of that belief was that defendant was "looking around." Jewell's subjective belief about the meaning of those eye movements is not objective evidence that defendant posed a threat to the officer or others. *See id.* at 511 (defendant's eyes "'darting around'" not objective evidence of officer-safety threat); *see also Rodriguez-Perez*, 262 Or App at 208, 215-16 (frisk of defendant not justified by officer-safety concern where defendant stopped for jaywalking became increasingly agitated after officer asked about weapons, defendant's "eyes got big, and he glanced to the left and right," and defendant "looked over his shoulder and took some steps away from [the officer], which [the officer] interpreted as defendant preparing to run away"; defendant "did not make any aggressive, hostile, or threatening movements" during the encounter).

Second, neither the bulges in defendant's pockets nor defendant's first reply that he did not know what was in his pockets transmutes the totality of circumstances into an objectively reasonable officer-safety concern. Jewell did not testify that he had any reason to believe that defendant possessed a weapon other than the general fact that defendant's pockets had "bulges." Jewell testified that, when he first noticed the bulges, he asked defendant about them because he "hoped it was a wallet with his I.D." Jewell did not otherwise describe the size or shape of the bulges, nor did Jewell testify that there was a reason to believe that the bulges were caused by a weapon. Rather, Jewell testified only that it was "a possibility" that defendant's pocket contained a weapon, and, when asked whether he was concerned at that point that defendant posed a threat, Jewell responded, "I didn't know at that point in time. I didn't know."

While that testimony is sufficient to support a finding that the officer *subjectively* believed defendant might have had a weapon, it does not provide specific and articulable facts supporting an *objectively* reasonable belief that defendant might have possessed a weapon. In *State v. Musalf*, 280 Or App 142, 155-57, 380 P3d 1087 (2016), we considered whether an officer was justified by safety concerns in reaching into a defendant's pocket after the officer felt a "hard object" during a consented patdown. The state argued that the officer's safety concern was reasonable under the totality of the circumstances, which included, among other facts, that the defendant made a furtive movement while inside a stopped vehicle, there appeared to be methamphetamine smeared on the seat where the defendant had been sitting, the defendant was in the company of known drug users, and, in the officer's experience, "'drug users possibly carry weapons' and methamphetamine users are an even greater risk than other drug users because of their 'erratic' behavior." *Musalf*, 280 Or App at 157.

We concluded that those factors did not support an officer-safety concern, and emphasized that, as in the present case, the defendant in *Musalf* was cooperative, made no hostile or threatening movements, and kept his hands visible throughout the encounter. *Id.* at 157-58. As related

to the hard object in the defendant's pocket, we noted that the officer "did not describe the object's dimensions or shape, nor did he explain what other particular circumstances supported a suspicion that the object was a weapon." *Id.* at 158. For those same reasons, we conclude that Jewell's concern about the "bulges" in defendant's pockets similarly lacked sufficient facts supporting an objectively reasonable concern for officer safety.[5] We further conclude that, although defendant's initial answer that he did not know what was in his pockets may have raised Jewell's suspicion, it likewise did not objectively indicate that defendant was carrying a weapon, much less that he might use such a weapon against Jewell.

Lastly, regarding the fact that Jewell had asked defendant to step out of the vehicle, we addressed that same factor in *Senn* and concluded that it did not tip the balance of facts toward supporting a reasonable officer-safety concern. 145 Or App at 545. We explained that the

"defendant's compliance with that request could not, in the context of this case, give rise to a reasonable suspicion of imminent dangerousness sufficient to satisfy *Bates*. We fully appreciate that, as a practical matter, [the officer] felt more vulnerable with defendant out of the car, where he had more freedom of movement. But the same might well be said in many, perhaps most, instances where an officer asks a person to leave a vehicle. Here, defendant, who had been fully cooperative throughout the stop, left the car only because of [the officer's] request. Where, as here, defendant's conduct while he was in the car was insufficient to warrant officer safety-related inquiries, defendant's ready

_____

[5] We note that the issue in *Musalf* arose in a slightly different context. There, the defendant had consented to the frisk of the exterior of his clothing, but challenged the search *into* his pocket as not supported by a valid officer-safety concern. Generally, where an officer performs a patdown pursuant to an officer-safety concern, the officer "may not conduct a further search unless the officer develops reasonable suspicion, based on specific and articulable facts, that the person poses a serious threat of harm and that a further search would lessen or eliminate that threat." *State v. Davenport*, 272 Or App 725, 731, 357 P3d 514, *adh'd to as modified on reh'g*, 275 Or App 20, 361 P3d 669 (2015), *rev den*, 359 Or 525 (2016). However, as the question for justifying either search under an officer-safety exception is whether there are "specific and articulable facts" that the defendant poses a threat, *Bates*, 304 Or at 524, we conclude that the reasoning from *Musalf* is applicable to the present case, despite the slightly different context.

compliance with the officer's request could not transmute and elevate the same circumstances into 'specific and articulable' facts sufficient to satisfy *Bates*."

*Id.* We conclude the same here. Defendant's compliance with Jewell's investigation fails to raise otherwise insufficient facts to the level of an officer-safety concern.

Accordingly, we conclude that Jewell's patdown search of defendant was not justified by a valid officer-safety concern and therefore was unlawful. The state makes no argument that the discovery of the evidence was attenuated from the unlawful search, and so we conclude that the trial court erred when it denied defendant's motion to suppress.[6] That error was not harmless. The evidence, which included more than a dozen individual bindles of methamphetamine, was central to the state's case against defendant for unlawful delivery of methamphetamine.

Conviction for unlawful delivery of methamphetamine reversed and remanded; otherwise affirmed.

---

[6] "Whenever the state has obtained evidence following the violation of a defendant's Article I, section 9, rights, it is presumed that the evidence was tainted by the violation and must be suppressed." *State v. Miller*, 267 Or App 382, 398, 340 P3d 740 (2014). The state makes no argument on appeal that, in the event we conclude that the search of defendant was unlawful, the challenged evidence was nevertheless admissible. Absent a developed argument by the state, we conclude that the evidence must be suppressed.