Argued and submitted August 30, 2016, affirmed February 23, petition for review denied August 3, 2017 (361 Or 801)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## JONATHAN ROBERT WILSON,
*Defendant-Appellant.*

Clackamas County Circuit Court
CR1313468; A158275

390 P3d 1114

Anna Melichar, Deputy Public Defender, argued the cause for appellant. With her on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Dustin Buehler, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Duncan, Presiding Judge, and DeVore, Judge, and Haselton, Senior Judge.

## DEVORE, J.

Defendant appeals a judgment of conviction for interfering with a peace officer. A person commits the offense of interfering with a peace officer, when, "knowing that another person is a peace officer," he or she "[r]efuses to obey a lawful order by the peace officer * * *." ORS 162.247(1)(b). Defendant assigns error to the trial court's denial of his motion for a judgment of acquittal. He argues that the state failed to present sufficient evidence that the deputy's order to exit his vehicle was lawful. The state argues that the order was justified by the officer safety doctrine.

When we review the denial of a motion for a judgment of acquittal, we view the facts in the light most favorable to the state. *State v. Evans*, 161 Or App 86, 89, 983 P2d 1055 (1999). We conclude that there is sufficient evidence and a lawful basis for the trial court to determine that the officer safety doctrine justified the deputy's order to exit the vehicle. Therefore, we affirm.

In a bench trial, deputies Sheldon and Shelly testified about the events that led to the charge. In November 2013, they were dispatched to a house in a "fairly high crime" area in Milwaukie. Dispatch had received information from a caller about a suspected burglary. The caller was not identified at trial. The caller said that two people were using a key to gain entry to the house, that the caller was a friend of the homeowner, and that the homeowner was out of town so no one should be present at the house at that time.

It was dark outside as the deputies approached the house. Although there were street lights in the area, the overhead trees and shrubbery rendered the lights "pretty much null and void." The only illumination was the deputies' flashlights. In the driveway, Shelly saw what he thought was a Ford Explorer that was backed into the driveway pointed out toward the road. Based on his training and experience, Sheldon recognized "that's a faster way to get out of a location." A vehicle will "typically back in" if the driver is "planning to make a speedy retreat." The headlights were turned off. Someone was inside the vehicle in the driver's seat. Because dispatch said that two people were attempting to break into the house, Sheldon was concerned that "possibly

one [person] had gotten into the house and one was sitting in the car."

The deputies identified themselves to defendant and asked him to roll down the window. They "just wanted to talk to him, figure out * * * why he was parked in that driveway, what his reason for being there was." Defendant did not roll down the window. He became "very agitated and started digging around by the center console area and the other side of the passenger seat." Neither deputy could see what defendant was attempting to reach, but they were nervous that he was looking for a weapon. A center console, according to Sheldon, is a "concealable spot that makes it very easy for that person to access weapons [or] any other things that they might use to hurt [the deputies]." Sheldon considered defendant's actions to be "extremely suspicious behavior given the circumstances." Sheldon ordered defendant to put his hands on the steering wheel, and defendant initially complied. Defendant asked why the deputies were there. Speaking loudly through the window, Sheldon explained that the deputies were investigating a potential burglary. At that point, defendant again "became agitated" and "reached down and grabbed his cell phone." Shelly drew his gun, and Sheldon displayed his Taser, but defendant continued to refuse to roll down the window to speak with them. Defendant "just kept talking on the phone." Sheldon ordered defendant to open the door and talk to the deputies, but defendant did neither.

While Sheldon reiterated the purpose of the investigation, defendant was "very agitated." Defendant "kept kind of flinging his body around," "bringing [his] phone up and down, trying to push real hard on the buttons, [and] looking all around the car." Sheldon repeated that the deputies were investigating a burglary, that they "needed to talk to him to figure out what was going on," and that defendant should open the door. Defendant refused. He told the deputies through the closed window that he knew the homeowner. Sheldon again instructed defendant to open the vehicle door, but defendant did not and refused to talk further. Sheldon ran the license plate number on the vehicle and learned that it was registered to an Oregon City address, not to the address of the house.

A third deputy, Peterson, arrived. Peterson advised Sheldon and Shelly, who were then at the driver's window, that he could see a knife with a six-inch blade resting between the center console and the passenger seat—the same place that defendant previously had been "digging." Upon hearing Peterson's report of the knife, defendant "reached down and grabbed [the knife] and chucked it on the passenger side floorboard." The "whole time [defendant] was panicked, fidgeting in the car." Sheldon repeated, "Open the door, talk to us, we got to figure this out. We're here for a burglary. You need to open the door and talk to us * * *." Still, defendant refused to open the door and exit the vehicle as directed.

Asked later if they had safety concerns, Sheldon testified:

> "Yes, with the weapon, the knife being down there, and it was dark at that time. So it was—only the light that was really available was the flashlight. So we wanted to get it out of the car and figure out if there [were] any additional weapons on the subject."

Putting the situation in perspective, Sheldon explained that it is not uncommon for deputies to respond to a potential burglary call and "have it be someone that [has] a perfect good right to be there." Sheldon said, "Most of the time people roll down the window and talk to you on their own." In this instance, however, defendant exhibited "extremely rare behavior," which "escalated" throughout the encounter. Sheldon opined that the deputies' actions "were a direct reflection of [defendant's] actions."

The deputies told defendant that if he failed to comply, they would arrest him for the offense of interfering with a peace officer. Because defendant continued to refuse to open the door, to step out, or to respond when told he was under arrest, the deputies' supervisor gave them permission to shatter the vehicle window. Defendant was removed from the vehicle and arrested.[1]

---

[1] Defendant became compliant. When Sheldon asked why defendant would not open the door to allow the deputies to identify him or talk to him, he told Sheldon that "he didn't know why." When Sheldon asked who defendant was trying to call, defendant said "he was trying to call a family attorney." Because defendant "calmed down a lot" and began to talk to the deputies, he was issued a citation, rather than taken to jail.

The state charged defendant with a single count of interfering with a peace officer. The state did not specify in the charging instrument, nor later elect at trial, which refusal to comply with the deputies' orders formed the basis for the count. At defendant's bench trial, he moved for a judgment of acquittal on the basis that the deputies had not given any "lawful order" that he refused to obey, within the meaning of ORS 162.247(1)(b). The trial court denied the motion.[2]

On appeal, defendant assigns error to the trial court's denial of his motion for a judgment of acquittal, making two principal arguments. First, he argues that the order to exit the vehicle was a stop that was not justified by reasonable suspicion of criminal activity. Second, he argues that the order to exit the vehicle was not justified by the officer safety doctrine. He explains that his behavior "unequivocally indicated that he did not wish to engage with the deputies whatsoever," and, therefore, he could not have caused the deputies to have reasonable suspicion that he might pose a threat to the deputies.

The state makes corresponding arguments in reverse order. The state argues that, because the order to exit the vehicle was based on officer safety concerns, it was a lawful order that defendant was required to obey, regardless of the legality of the original or underlying encounter. In the alternative, the state argues that the order was lawful because the caller's report, the deputy's observations, and defendant's erratic behavior gave the deputies reasonable suspicion of a crime by the time they effected a stop of defendant.

In resolving this appeal, we need not decide whether the deputies had reasonable suspicion to stop defendant to inquire about burglary at a point in time prior to the ultimate order to exit the vehicle—the order whose lawfulness is at issue. That is so because, even if the initial seizure of defendant was unlawful as unjustified by reasonable suspicion of burglary, the ultimate order to get out of the car would be lawful if, in the totality of the circumstances,

---

[2] The trial court did not initially specify an order in its ruling denying defendant's motion. The court later specified that the ultimate order to exit the vehicle was the basis for its verdict. The parties focus on that order on appeal.

that order was justified by legally sufficient officer safety concerns. *See, e.g., State v. Bistrika*, 261 Or App 710, 718, 322 P3d 583, *rev den*, 356 Or 397 (2014), *cert den*, ___ US ___ (2015) (assessing lawfulness of officer's order in terms of officer safety doctrine). The circumstances pertinent to the determination of officer safety include those relating to defendant's possible involvement in ongoing, contemporaneous criminal conduct, regardless of whether those circumstances were sufficient to establish reasonable suspicion. On this record, the trial court did not err in determining that the operative order was so justified, and, hence, was a "lawful order" for purposes of ORS 162.247(1)(b). Accordingly, the trial court did not err in denying defendant's motion for a judgment of acquittal.

"An order is 'lawful' if it is authorized by, and is not contrary to, substantive law." *State v. Navickas*, 271 Or App 447, 450, 351 P3d 801, *rev den*, 358 Or 248 (2015) (citing *State v. Ausmus*, 336 Or 493, 504, 85 P3d 864 (2004)). "When examining whether an order is 'lawful,' *** we look at whether the order at issue was lawful on its face." *Id.* at 451. Of critical importance here, "the 'lawfulness of the order disobeyed is to be judged independently of the validity of the initial police-citizen confrontation.'" *Bistrika*, 261 Or App at 718 (quoting *State v. Rodinsky*, 60 Or App 193, 196, 653 P2d 551 (1982)). Thus, even if defendant was stopped unconstitutionally, the officer safety doctrine could provide Sheldon with the lawful authority to order defendant to get out of the vehicle. *See id.*; *see also State v. Neill*, 216 Or App 499, 508-09, 173 P3d 1262 (2007), *rev den*, 344 Or 671 (2008) (concluding that orders to sit down and not move, made for purpose of officers' safety, were lawful, even if the officers were unlawfully in the defendant's home).[3]

Oregon courts recognize that an officer "must be allowed considerable latitude to take safety precautions" during a stop, taking into account the circumstances "as

---

[3] The state submits, and, on appeal, defendant does not dispute, that "[t]he deputies did not seize defendant until they ordered him to place his hands on the steering wheel." That event occurred moments before the disputed order to get out of the vehicle. As a consequence, this case is in the same posture as *Neill*, 216 Or App at 508-09, insofar as the deputies issued an order in the course of a disputed seizure of defendant.

they reasonably appeared at the time." *State v. Bates*, 304 Or 519, 524-25, 747 P2d 991 (1987). The officer safety doctrine requires that an officer have reasonable suspicion, based on specific and articulable facts, that an individual "might pose an immediate threat of serious physical injury" to the officer or to other individuals present. *Id.* "There may be little or no time in which to weigh the magnitude of a potential safety risk against the intrusiveness of protective measures." *Id.* Therefore, "it is not our function to uncharitably second-guess an officer's judgment." *Id.*

Under circumstances comparable to those presented here, we have consistently concluded that officer safety concerns justified similar directives. Those cases have focused on a defendant's noncompliance with simple requests or instructions, sudden unpredictable movements in obstructed or concealed areas, and the likelihood that a weapon was within reach. *See, e.g., State v. Morgan*, 348 Or 283, 230 P3d 928 (2010) (sudden change in demeanor, sudden reaching into purse, sufficient to justify officer safety exception); *State v. Haney*, 158 Or App 53, 973 P2d 359 (1999) (two passengers reaching beneath seat, making furtive movements, and reluctance to follow officers' instructions).[4] A defendant's disregard for instructions becomes significant when reaching toward areas that could not be readily observed from outside a vehicle. *See, e.g., State v. Lee*, 264 Or App 350, 356-57, 332 P3d 894 (2014) (vehicle occupant moving around, reaching to his side, and, despite deputy's instruction, reaching down to the floorboard); *see also State v. Stephens*, 184 Or App 556, 561, 56 P3d 950 (2002), *rev den*, 335 Or 195 (2003) (even when a defendant tells of a knife in his pocket when reaching into the pocket, officer safety justified the officer's seizure of the knife from the pocket because the encounter was at 3:00 a.m. and the defendant's movement was "unusual and immediately dangerous").

Of particular significance, we have noted that the "presence of a weapon" is a fact that may support a concern for officer safety. *See, e.g., State v. Thomas*, 276 Or App 334,

---

[4] Where there are countervailing circumstances—a defendant remains cooperative "at all times" and "made no suspicious movements during his interaction with the police officers" involved in the encounter—we have reached the opposite result. *State v. Amell*, 230 Or App 336, 345, 215 P3d 910 (2009).

339, 367 P3d 537 (2016) (citing *State v. Miglavs*, 337 Or 1, 13-14, 90 P3d 607 (2004) and *State v. Hendricks*, 213 Or App 360, 367-68, 160 P3d 1014, *rev den*, 343 Or 467 (2007)).[5]

In this case, the deputies responded to a report of a burglary in progress in a dark area on a November evening. This was not a daytime encounter involving jaywalking. *See, e.g., Thomas*, 276 Or App at 340-41 (officer safety doctrine did not justify patdown at 11:00 a.m. in a jaywalking stop when defendant would not make eye contact and was a "little" uncomfortable). Some of the circumstances that contribute to reasonable suspicion of a reported crime did exist. The deputies had information that a caller had reported two men attempting to gain entry into a home while the occupant was away. And, the deputies arrived to make their own independent observations of a car and at least one man at the same address reported by the caller. *Cf. State v. Simpson*, 245 Or App 152, 155, 261 P3d 90 (2011) (citing *State v. Bybee*, 131 Or App 492, 495, 884 P2d 906 (1994), for consideration of indicia of reliability). In other words, the scene was at least consistent with the report of a potential burglary in progress, regardless whether the circumstances sufficed as reasonable suspicion of burglary.[6]

Those circumstances were relevant insofar as they contributed to make it reasonable for the deputies to think that defendant might pose an immediate threat of serious physical harm. Potentially, a look-out man or a get-away driver could present a greater risk to an officer than a jaywalking pedestrian. *See, e.g., State v. Stanley*, 325 Or 239, 245, 935 P2d 1202 (1997) (where officer responded to a report of a possible robbery, knew that robbers may be armed, and defendant behaved nervously, officer safety justified frisk of defendant).

---

[5] Generally, that fact, by itself, of course, is insufficient. *State v. Smith*, 277 Or App 298, 307, 373 P3d 1089, *rev den*, 360 Or 401 (2016). And, yet, discovery of one weapon may mean a chance of another. *State v. Pope*, 150 Or App 457, 462-63, 946 P2d 1157 (1997), *rev den*, 327 Or 521 (1998).

[6] Based on *Simpson*, the state contends that the deputies had reasonable suspicion of a crime so as to justify the disputed order. In *Simpson*, reasonable suspicion of a crime was found, based on a report from an unidentified caller, the caller's personal observations, and confirming observations of the officer. 245 Or App at 157-58. As noted above, we do not need to reach the issue of reasonable suspicion of criminal activity in this case.

The deputies found a car parked, as if for an escape, with its headlights turned off. Working in the dark with flashlights, the deputies encountered defendant who refused to keep his hands on the steering wheel, who refused to roll down the vehicle's window, who possessed a large knife, who refused to open the door, and who refused to step out of the vehicle. From the outset, defendant was agitated. He immediately "started digging around by the center console area and the other side of the passenger seat." After placing his hands on the steering wheel, he returned to erratic behavior. At that point, defendant became "further agitated." He was "flinging" his body about in the vehicle, raising and lowering his phone, and "looking all around the car." Neither deputy could discern what defendant was searching for, and they were nervous that he might be trying to reach for a weapon. Defendant's conduct was "extremely rare," and over time it "escalated."

Defendant argues that he mitigated any reasonable concern for safety by throwing the knife to the passenger floorboard once the knife had been spotted. We are unpersuaded that moving the knife eliminates justification for the deputy's order—for two reasons. First, the knife remained accessible to defendant within the vehicle. Second, the presence of one weapon "may reasonably increase, rather than lessen, the officer's suspicion that the party is holding additional weapons." *State v. Pope*, 150 Or App 457, 462-63, 946 P2d 1157 (1997), *rev den*, 327 Or 521 (1998); *see also Bates*, 304 Or at 522-23 (reciting facts of *Michigan v. Long*, 463 US 1032, 103 S Ct 3469, 77 L Ed 2d 1201 (1983), where police officers saw a large hunting knife on the floorboard of the defendant's car, then frisked the defendant and searched the car in a protective search that was "clearly justified" under the Fourth Amendment due to the danger that the defendant could *reenter* his vehicle). Defendant's action, like a defendant who tells an officer of a knife in his pocket, does not obviate the officer safety concern arising from the circumstances. *See Stephens*, 184 Or App at 561 (telling officer about the knife in pocket, while reaching for it, did not obviate officer safety concern).

Given our standard of review of a motion for judgment of acquittal, *Evans*, 161 Or App at 89, we conclude that

the trial court, as a rational factfinder, could find the predicate facts to support reasonable suspicion that defendant might pose an immediate threat of serious physical injury. Based on the doctrine of officer safety, and regardless of the dispute over the lawfulness of the stop, the trial court could determine that Sheldon issued a lawful order for defendant to exit the vehicle. Therefore, the trial court did not err in denying the defendant's motion for a judgment of acquittal.

Affirmed.