Argued and submitted December 6, 2018, reversed and remanded
December 9, 2020

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

XAVIER LEE BAILEY,
*Defendant-Appellant.*

Marion County Circuit Court
16CR74813; A164732

479 P3d 304

Defendant, who entered a conditional guilty plea for unlawful possession of a firearm, ORS 166.250, appeals the trial court's denial of his motion to suppress evidence discovered in the course of an officer-safety search. On appeal, defendant argues that the officers who searched him did not have a valid officer-safety justification to do so in light of his cooperative and nonthreatening behavior. The state contends that, under the totality of the circumstances, the officers' subjective belief that defendant posed an immediate threat to their safety was objectively reasonable. *Held*: The trial court erred in denying defendant's motion to suppress. Although defendant might have had a weapon that he wanted to keep hidden, nothing about the circumstances made it objectively reasonable for the officers to suspect that he might use it or otherwise cause them bodily harm.

Reversed and remanded.

David E Leith, Judge.

Kyle Krohn, Deputy Public Defender, argued the cause for appellant. Also on the brief was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Julia Glick, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before DeHoog, Presiding Judge, and DeVore, Judge, and Aoyagi, Judge.*

DeHOOG, P. J.

Reversed and remanded.

_____

\* DeVore, J., *vice* Hadlock, J. pro tempore.

## DeHOOG, P. J.

Defendant entered a conditional guilty plea to unlawful possession of a firearm, ORS 166.250, reserving his right to appeal the trial court's denial of his motion to suppress evidence discovered in the course of an officer-safety search. On appeal, defendant contends that the officers who patted him down for weapons did not have a valid officer-safety justification to do so. Defendant does not dispute that the officers subjectively believed that he posed a potential threat to their safety, but he argues that their belief was not objectively reasonable, particularly in light of his cooperative and nonthreatening behavior throughout the encounter. Defendant further argues that, even if he initially posed a potential threat, by the time of the search any such threat had dissipated because, by that time, he had been placed in handcuffs and three officers were present. Considering, as we must, the totality of the circumstances, we conclude that the officers' subjective suspicion that defendant both was armed *and* posed an immediate threat at the time of the patdown search was not objectively reasonable. Thus, the trial court erred in concluding that the search was a reasonable officer-safety measure. We therefore reverse and remand for further proceedings.

"We review the denial of a motion to suppress for legal error and are bound by the trial court's explicit and implicit factual findings if evidence in the record supports them." *State v. Sarmento*, 296 Or App 763, 765, 439 P3d 994 (2019). We state the facts in accordance with that standard.

After midnight, Salem police officers Chrowl and Bratley responded to a noise complaint connected with a house party near the end of a dead-end street, Suzanne Lea Street. The officers initially spoke with the homeowner at the front doorway. The officers caught a brief glimpse of the party as the homeowner stepped outside to speak with them. They saw "a crowd of individuals inside," but they did not note any specific individuals. The party was "dead quiet" while the officers spoke with the homeowner, and they "heard the distinct sound of a firearm being chambered or racked" somewhere inside the house. In response, the officers moved the conversation away from the front door. However, because

the homeowner agreed to keep the noise down, the officers did not enter the home or take any further action at that time.

Later that morning, at about 5:00 a.m., Officer Chrowl returned to the area, this time in response to a complaint that people connected with the house were yelling in the yard and street. Upon his arrival, dispatch notified Chrowl that there had also been reports of gunshots at the end of the same street. Chrowl stepped out of his patrol car and saw someone—later identified as defendant— walking away from Suzanne Lea Street. By that time, Officer Singleton had arrived. The officers did not see anyone else on the street and began to follow defendant in an effort to speak with him. When defendant noticed the officers, he increased his pace and distance from them. In his report of the incident, Chrowl described defendant's gait and subsequent behavior as "nonchalant." Chrowl and Singleton caught up with defendant shortly thereafter, when defendant stopped in a nearby parking lot to speak with another individual, Flowers, who had happened to be passing by on a bicycle.

Chrowl called out to defendant and Flowers from a distance of about 25 feet and asked them whether they would be willing to speak with him. Both men turned around, walked back towards Chrowl, and responded "Yeah." Flowers spoke first and asked Chrowl if he had heard the gun shots. Chrowl explained that the shots were the reason that he wanted to speak with them, and he asked whether defendant had been at the party on Suzanne Lea Street. Defendant told Chrowl that he had been at the party, but, in response to further questioning, he said that he did not think that he had been there when Chrowl stopped by to address the noise complaint.

While defendant and Chrowl were speaking, a third officer, Dowd, arrived on the scene. When Chrowl began to explain the situation to Dowd, Dowd mentioned that something "just didn't seem right" with defendant and noted "the way [he was] standing." Chrowl then observed that defendant's "arms were tucked in super tight; he wasn't really moving his arm from the elbow up, only the elbow down,

kind of like a hinge." Chrowl also noticed "what looked like a line" in the "upper pectoral area" of defendant's jacket, which, to Chrowl, "wasn't natural, wasn't normal looking." Chrowl thought that "it appeared something was either concealed or inside [defendant's] jacket or underneath" it.

Because they "were specifically concerned about weapons[, and] firearms in particular," Chrowl and Dowd approached defendant and asked whether they could pat him down. According to Chrowl, defendant "said something to the effect of, 'I don't know why you need to,'" and, at that point, the officers placed defendant in handcuffs and patted him down. During the patdown, Chrowl felt "an upside-down L-shaped object" near defendant's chest and thought that what he felt was the handgrip of a firearm. Based on that belief, Chrowl unzipped defendant's jacket and seized what was indeed a handgun.

The state subsequently charged defendant with the offense of unlawful possession of a firearm, ORS 166.250. Defendant moved to suppress all evidence of his possession of the handgun, arguing, in part, that it had been discovered in the course of an unconstitutional, warrantless search. At the suppression hearing, Chrowl and Dowd both testified that they had subjected defendant to a patdown search to ensure their safety.[1] When asked further about why he had found it necessary to search defendant for weapons, Chrowl testified that, when he asked for defendant's consent to pat him down, defendant had "started kind of leaning back [and] looking away." Chrowl construed those as "signs [that defendant] didn't want to be there; he was wanting to leave at that point, especially when we started asking for consent to pat down." Those circumstances caused Chrowl to question "whether he was trying to flight or fight at that point."

---

[1] Chrowl's testimony was somewhat equivocal as to whether he had also suspected defendant of criminal activity prior to the patdown. Dowd similarly alluded to having suspected defendant of unlawfully concealing a firearm or having unlawfully used a firearm earlier that morning. However, although the trial court asked questions regarding the specific crimes that Chrowl had suspected, the court appears ultimately to have relied exclusively on the officer-safety doctrine in its ruling, and the state defends the court's ruling solely on that basis; accordingly, we consider only that potential justification for the warrantless search that occurred.

Later in the hearing, in response to the trial court's question as to what specific crimes he had suspected, Chrowl reiterated, "He was giving the stance that he was wanting to flight [sic], could be concealing something dangerous or deadly."

Dowd's testimony was similar to Chrowl's, though, as noted, he testified to having also suspected defendant of committing the crimes of "concealing a firearm" and unlawful use of a weapon. As to his safety concerns, Dowd observed that, upon being asked to consent to a patdown search, defendant "turned his body away from Officer Chrowl and started to step back, like he was trying to distance himself from Officer Chrowl as he was verbally objecting to a pat down." Dowd explained that he "didn't want a gun to produce itself and become a deadly force encounter with" defendant.

At the conclusion of the suppression hearing, the trial court denied defendant's motion, explaining its view that "the danger of serious physical injury was clear enough" and that it "would be out of bounds to second guess an officer's" judgment under the circumstances. The court then summarized the circumstances as it saw them, beginning with those that factored little if at all in its analysis. First, the court noted that the fact that officers had heard a gun being "racked and chambered" during an earlier encounter at the same location did *not* weigh heavily into the analysis; that, the court explained, was because any inference that defendant was carrying the same gun would be a "weak one." Second, the court reasoned that defendant's assertion of his right to withhold consent could play no role in its analysis. Finally, as to the perception that defendant might have been preparing to flee, the court stated without further elaboration that it was not a prominent factor in its analysis.

Turning to the facts that it considered significant to its analysis, the trial court summarized those to be "that [defendant] was coming from the location where gunfire had recently been heard; his stance, where he appeared to be holding something under his upper arms, and in fact the officers could see in the jacket the outline of something

consistent with a weapon."[2] In light of those facts, the trial court concluded that

> "[t]he officers reasonabl[y] suspected that they needed to take some action to protect their safety, and also out of suspicion that that was, in fact, a concealed weapon. So there was a reasonable suspicion to support the brief stop and pat down to determine whether there was a weapon in that location, and it turned out there was."

On appeal, the parties agree that the only issue before us is whether the officer-safety doctrine justified the warrantless search. That is, defendant does not challenge the lawfulness of the officers' conduct leading up to the search, and, although Dowd testified that he suspected defendant of various weapons-related offenses, the state does not reprise the argument it made to the trial court that defendant had been lawfully detained based on reasonable suspicion of a crime.[3] As to the officer-safety justification for the patdown search, defendant argues that the requirements of that exception to the warrant requirement, as articulated by the Supreme Court in *State v. Bates* 304 Or 519, 524, 747 P2d 991 (1987), were not satisfied here. Specifically, defendant argues that, under the *Bates* standard, the officers' subjective belief that he posed a threat of serious bodily harm to them was not objectively reasonable.

Defendant argues in the alternative that, even if the officers' belief was objectively reasonable at some point earlier in the encounter, it was no longer reasonable at the time of the patdown search, by which time defendant was

---

[2] As outlined above, Chrowl testified that he saw an unnatural line in defendant's jacket in his upper-chest area; Chrowl also explained that the line caused it to appear as though there was "some kind of object in there," as the rest of defendant's jacket did not have such lines. Chrowl did not, however, describe what he perceived as "consistent with a weapon." Rather, that appears to be an inference that the trial court drew.

[3] In limiting the argument in that fashion, the parties do not discuss whether defendant was legally stopped prior to the patdown search or whether a legal stop must precede a warrantless search for officer-safety reasons. Accordingly, we express no view on those issues. *See State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987) (explaining that the officer-safety doctrine applies when certain circumstances arise "during the course of a lawful encounter with a citizen"); *but see State v. Meeker*, 293 Or App 82, 85-86, 427 P3d 1114 (2018) (declining to "resolve the parties' dispute regarding the applicability of the officer safety doctrine to mere conversation encounters").

in handcuffs and a total of three officers were present. *See State v. Kennedy*, 284 Or App 268, 272, 392 P3d 382 (2017) ("Determining whether an officer's safety concern was objectively reasonable requires us to consider the totality of the circumstances as they reasonably appeared to the officer at the time of the warrantless search.").

Contending that an officer's assessment of safety risks is entitled to considerable deference, the state responds that, under the totality of the circumstances, the officer-safety doctrine justified a patdown; that is, the officers' belief that defendant posed a threat to them was objectively reasonable. As to defendant's argument regarding the officers' belief at the specific moment of the patdown, the state contends that measures taken to effectuate a lawful patdown search—such as flanking a suspect and placing him or her in handcuffs—play no role in our assessment of whether a patdown was justified in the first place. And, to the extent that defendant argues that the manner in which the officers conducted the patdown was itself unreasonable, the state argues that defendant did not preserve that argument. We turn to those arguments.

We start with a review of the applicable legal standards. Article I, section 9, of the Oregon Constitution recognizes a citizen's right "to be secure in their persons *** against unreasonable search, or seizure." To that end, warrantless searches are presumed to be unreasonable and must be justified by a recognized exception to the warrant requirement. *See State v. Bliss*, 363 Or 426, 430, 423 P3d 53 (2018) ("[W]arrantless searches are *per se* unreasonable unless they fall within one of the few specifically established and limited exceptions to the warrant requirement."). In *Bates*, 304 Or at 524, the Supreme Court explained how officer-safety searches such as the patdown in this case can fall within such an exception:

> "Article I, section 9, of the Oregon Constitution, does not forbid an officer to take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present."

"[U]nder the officer-safety doctrine, the state bears a two-part burden of proof and persuasion" to justify a warrantless search. *State v. Ramirez*, 305 Or App 195, 205, 468 P3d 1006 (2020). First, the state must prove that an officer "had subjective reasonable suspicion" that the person searched posed an immediate threat of serious physical injury. *Id.* Second, the state must prove that, "under the totality of the circumstances, (1) the officer's subjective safety concerns of an immediate threat of serious physical injury were objectively reasonable, and * * * (2) the officer's response to the safety concerns was, itself, objectively reasonable." *Id.* As the Supreme Court has explained, the officer-safety doctrine requires the state to prove only "that the choice of protective measures actually made [was] reasonable, even if other choices also would have been reasonable." *State v. Madden*, 363 Or 703, 714, 427 P3d 157 (2018) (internal quotation marks and brackets omitted).

The officer-safety doctrine requires a careful balance of "the individual's constitutional right to security in his or her person and an officer's right to take reasonable safety measures." *State v. Davis*, 282 Or App 660, 667, 385 P3d 1253 (2016). We recognize that police officers "in the field frequently must make life-or-death decisions in a matter of seconds," and "[a]n officer must be allowed considerable latitude to take safety precautions in such situations." *Bates*, 304 Or at 524; *see also State v. Rudder*, 347 Or 14, 22, 217 P3d 1064 (2009) ("[P]olice officers must be allowed considerable latitude to take protective measures when they reasonably feel threatened." (Internal quotation marks omitted.)); *State v. Wilson*, 283 Or App 823, 828-29, 390 P3d 1114, *rev den*, 361 Or 801 (2017) (same). To that end, " 'it is not our function to *uncharitably* second-guess an officer's judgment.' " *Wilson*, 283 Or App at 829 (quoting *Bates*, 304 Or at 524 (emphasis added)). Nonetheless, we must bear in mind that "[t]he 'concept of reasonableness in this context is not biased in favor of the concerns of the police.' " *Ramirez*, 305 Or App at 206 (quoting *Rudder*, 347 Or at 23). And, to maintain a proper balance, we evaluate an officer's expressed safety concerns through an objective lens, requiring reasonable suspicion to be "based on facts specific to the particular person searched, not on intuition or a generalized fear that the person may

pose a threat to the officer's safety." *Kennedy*, 284 Or App at 273 (internal quotation marks omitted). We proceed with that balance in mind.

We address defendant's secondary argument first because it serves to sharpen our focus on the appropriate time frame. As noted, defendant emphasizes that the relevant time in assessing the objective reasonableness of the officers' safety concerns is "at the time" of the search. *See, e.g.*, *Kennedy*, 284 Or App at 272 (discussing that we consider the circumstances "at the time of the warrantless search"); *see also State v. Jackson*, 190 Or App 194, 199, 78 P3d 584 (2003), *rev den*, 337 Or 182 (2004) (considering the circumstances officers faced "at the time of the patdown"). And, defendant argues, "at the time" that the officers searched him, he could not reasonably have been considered a potential threat, because he was both handcuffed and outnumbered, with two officers flanking him and a third standing by.

In our view, defendant's focus on the instant that the officers carried out the patdown is too narrow. As *Bates* and subsequent decisions have held, we must assess the circumstances as they appeared to the officers at the time that the decision was made to take safety precautions. *See Bates*, 304 Or at 525 (limiting reasonableness inquiry to the "circumstances as they reasonably appeared at the time that the decision was made"); *see also State v. Jimenez*, 357 Or 417, 423, 353 P3d 1227 (2015) (quoting *Bates*); *State v. Foster*, 347 Or 1, 8, 217 P3d 168 (2009) (same); *State v. Ehly*, 317 Or 66, 82, 854 P2d 421 (1993) (same); *State v. Lee*, 264 Or App 350, 354, 332 P3d 894 (2014) (same); *State v. Amell*, 230 Or App 336, 340, 215 P3d 910 (2009) (same). Thus, as the state contends, safety measures taken by officers in effectuating a patdown are not part of the totality of the circumstances for purposes of assessing the reasonableness of the officers' safety concerns; rather, they are part of the search itself.

In light of that case law, we look to the totality of the circumstances at the time that the officers decided to search defendant. Here, because defendant does not appear to dispute that the officers handcuffed and flanked him

*after* deciding to pat him down, we view those actions as precautions taken to ensure that the patdown itself proceeded safely, and not as circumstances that could have alleviated the need for an officer-safety search altogether.[4] Thus, we turn our focus to the subject of defendant's primary argument, namely, whether, at the time that they decided to conduct a patdown search, it was objectively reasonable for the officers to suspect that defendant posed an immediate threat of serious physical injury.

In arguing that the officers' subjective safety concerns were not objectively reasonable, defendant acknowledges that we must base our assessment of an officer's belief on the totality of the circumstances, and not on isolated factors that may be present. Nonetheless, he contends that some factors are entitled to more weight than others, arguing that the "most important factor in an officer-safety determination is the defendant's conduct." In support of that view, defendant observes that "Oregon appellate courts have repeatedly repudiated officer-safety searches when the defendant was cooperative and displayed no aggressive or threatening behavior." According to defendant, Oregon courts consistently reach the same conclusion even when a person possesses a weapon, so long as the person's behavior does not suggest that he or she is armed *and dangerous*.

To defendant, then, the behavior he exhibited during the police encounter is necessarily dispositive. According to defendant, he "never acted in an aggressive or threatening manner and never displayed any signs of agitation or hostility." Rather, he was cooperative and complied with all of the officers' requests. Defendant adds that the officers knew nothing about his background that might have suggested to them that he presented a threat to their safety.[5] Therefore,

---

[4] We reject without discussion any intended argument that the search itself was not carried out in a reasonable manner. *Cf. City of Portland v. Weigel*, 276 Or App 342, 345-46, 367 P3d 541 (2016) (handcuffing the defendant was reasonable because, in part, he had access to a firearm that was "capable of inflicting serious bodily injury"). Accordingly, we need not belabor whether any such argument is preserved.

[5] Chrowl testified that he recognized defendant's face after catching up with him, but he did not purport to associate defendant with any particular history or circumstances that might have contributed to Chrowl's officer-safety concerns.

defendant concludes, any belief on the part of the officers that he posed an immediate threat of serious injury cannot be considered objectively reasonable.

For its part, the state does not dispute defendant's characterization of his own conduct as compliant and cooperative. The state emphasizes, however, our obligation to consider the totality of the circumstances, and argues that defendant's behavior is just one factor in the analysis; here, the state asserts, defendant's behavior "did not dispel the officers' reasonable suspicion of a safety threat."

As the Supreme Court has explained, a "defendant's attitude and demeanor are just two circumstances that the officers and, ultimately, [the] court must consider in determining whether the totality of the circumstances justified the decision to engage in a precautionary patdown." *State v. Miglavs*, 337 Or 1, 11-12, 90 P3d 607 (2004). And, as we have observed, those two factors "are by no means dispositive." *Kennedy*, 284 Or App at 274. Thus, contrary to defendant's suggestion, the fact that he was not overtly threatening or uncooperative does not control here.

Having said that, we recognize that a defendant's compliant behavior may play a significant role in our determination of whether officer-safety concerns justify a search. In *Kennedy*, for example, where we concluded that a patdown for officer-safety reasons was not justified, we reasoned, in part, that the defendant's compliant behavior and lack of aggressive behavior were "significant factors ***, particularly given the absence of any information that defendant had engaged in earlier acts of violence." *Id.* Similarly, we have explained that, "where a defendant cooperates with police, in the absence of any threatening behavior by the defendant, generalized safety concerns (in other words, facts that are not particular to the defendant) are insufficient to justify an officer safety search." *State v. Smith*, 277 Or App 298, 305, 373 P3d 1089, *rev den*, 360 Or 401 (2016). However, although such decisions recognize that a defendant's behavior may be significant to our analysis, they consistently weigh that factor in the context of any other circumstances present or facts that an officer may have known about the person at the time.

Here, defendant's compliant and nonthreatening demeanor was only one of the particularized facts and circumstances relevant to the officers' assessment of whether he posed a threat. The state points to additional pertinent facts, including that: (1) defendant was the only person seen walking away from a location where officers had heard a gun being "chambered or racked" in their presence earlier that morning; (2) he was walking away from that location moments after gunshots were reportedly heard in the area; (3) defendant increased his pace when he noticed the officers following him; (4) defendant confirmed having been at the house party shortly before the police encountered him; (5) defendant stood in an unnatural way with his upper arms held close to his sides, which, coupled with a noticeable line in his jacket, gave the officers the impression that he might be concealing a weapon; and (6) defendant exhibited somewhat of a fight or flight response when he was asked whether he would consent to a patdown search.

We largely agree with the trial court's assessment of those facts, but we draw from them a different conclusion. As the trial court apparently recognized, there was little or nothing to connect any firearm that defendant might possess with the firearm that Chrowl had heard being "racked" in his presence hours earlier that morning; to draw from that already tenuous link the further inference that defendant might bear some degree of hostility towards the police would be wholly speculative. Furthermore, the trial court correctly acknowledged that defendant's exercise of his right to refuse consent could play no role in its assessment whether the officers' perception of a threat was objectively reasonable.[6]

That leaves the following circumstances: Defendant was seen leaving the general area where shots had recently

_____

[6] To the extent that defendant may have been exercising his right to deny consent to a warrantless search, we agree that his reluctance to give that consent could not have provided objective support for the officers' belief that he posed a threat to them. *See State v. Banks*, 364 Or 332, 337, 434 P3d 361 (2019) (discussing the "voluntary consent to search" exception to the warrant requirement of Article I, section 9). We similarly attach no significance to any disinterest in speaking with the police that defendant may have exhibited when he "nonchalant[ly]" picked up his pace upon Chrowl's arrival.

been fired, he appeared as though he could be hiding a weapon under one of his arms within his jacket,[7] and, although defendant was compliant and nonthreatening throughout the encounter, when asked for his consent to a search, he appeared to Chrowl to be "wanting to flight [*sic*]," and, according to Dowd, had "started to step back, like he was trying to distance himself from Officer Chrowl as he was verbally objecting to a pat down." We appreciate Dowd's rationale that he and the other officers "didn't want a gun to produce itself and become a deadly force encounter with" defendant, and the trial court's reluctance to second guess that judgment is understandable. Our task, however, is to determine whether the officers' suspicion that defendant presented that sort of threat was objectively reasonable under the totality of the circumstances, including defendant's compliant demeanor. We conclude that it was not.

In reaching that conclusion, we assume without deciding that it was objectively reasonable for the officers to suspect that defendant had a weapon hidden under his jacket. The question here, however, is whether what might support reasonable suspicion of unlawful possession of a weapon—which would not itself be sufficient to justify a warrantless search—is sufficient to justify an officer-safety search when accompanied by the other circumstances present here. Stated slightly differently, given that the mere fact that a person possesses a weapon does not, *per se*, render officer-safety concerns objectively reasonable, do the circumstances under which defendant was suspected of possessing a weapon in this case reasonably support the officers' suspicion that defendant represented an immediate threat of serious bodily injury?

Again, those circumstances are that defendant had recently been in the general area where shots had been fired, and, it seems, he preferred to end a voluntary conversation

---

[7] We note that the trial court appears to have understood the officers to have testified that they "could see in [defendant's] jacket the *outline* of something *consistent with a weapon*." (Emphases added.) Our review of the record indicates that, although the officers saw an unnatural "line" in defendant's jacket that they were concerned could be a weapon, they neither described an "outline" nor said it was "consistent" with anything. Ultimately, however, that distinction does not affect the outcome of this case.

with Chrowl over remaining and being subjected to a warrantless search. Like the firearm Chrowl heard being racked much earlier that morning, nothing connected defendant with the shots heard being fired, much less suggested that he was the shooter. Moreover, because defendant was not under arrest or any other obligation to remain with Chrowl, there was no reason to suspect that he might resort to violence to effect a departure, especially in light of his cooperative demeanor up to that point. Thus, even if the officers correctly perceived that defendant wanted to depart, there was no reason for the officers to suspect that his desire to leave put them in harm's way.[8]

In light of those circumstances, the officers' subjective suspicion that defendant presented an immediate threat of serious bodily injury was not objectively reasonable. That is, even though defendant seemed as though he might have a weapon *that he wanted to keep hidden* and was contemplating breaking off the police encounter, nothing about the circumstances made it objectively reasonable for Chrowl or the other officers to suspect that he might cause them bodily harm to achieve those objectives. And, although the fact that defendant had come from an area where gunshots were heard may have contributed to the officers' suspicion that defendant possessed a weapon, the state has not identified any way in which that fact would, in this case, further support the suspicion that defendant represented a threat to anyone. As a result, the trial court erred in denying defendant's motion to suppress evidence resulting from the warrantless patdown search.

Reversed and remanded.

---

[8] Although Chrowl testified to having been uncertain whether defendant was trying to "flight" *or fight* at that point, it is evident from the balance of both officers' testimony that, despite Chrowl's recitation of a familiar phrase, the officers suspected that he might try to leave the area, not that he was contemplating an imminent attack.