No. 738 August 20, 2025 649

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

TRAMAINE JUSTIN IVEY,
*Defendant-Appellant.*

Multnomah County Circuit Court
23CR04322; A182439

Rima I. Ghandour, Judge.

Argued and submitted June 2, 2025.

Stacy M. Du Clos, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Oregon Public Defense Commission.

Timothy A. Sylwester, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Aoyagi, Presiding Judge, Egan, Judge, and Pagán, Judge.

EGAN, J.

Reversed and remanded.

**EGAN, J.**

In this criminal case, defendant appeals from a judgment of conviction for felon in possession of a firearm, ORS 166.270(1) (Count 1), and unlawful possession of a firearm, ORS 166.250(1) (Count 2). He assigns error to (1) the denial of his motion to suppress evidence discovered as a result of an allegedly unlawful search of his car and seizure of a firearm, and (2) the denial of his demurrer to the charge of felon in possession of a firearm, in which he argued that ORS 166.270 violated the Second Amendment as applied to him, because his predicate felony conviction is for unlawful use of a vehicle (UUV). For the reasons explained below, we hold that the trial court erred in denying defendant's motion to suppress but that it properly denied his demurrer. Accordingly, we reverse and remand.

## FACTS

The facts are relevant only to the motion to suppress, so we state the facts in accordance with the standard of review for that motion. "In reviewing a denial of a motion to suppress, we are bound by the trial court's findings of historical fact that are supported by evidence in the record." *State v. Leiby*, 293 Or App 293, 294, 427 P3d 1141 (2018). We therefore "state the facts consistently with the trial court's explicit and implicit factual findings [that] the record supports." *Id*.

Around 9:30 p.m., Multnomah County Sheriff's Deputy Mark Farmer was patrolling in a "high crime area." He observed defendant driving a "blacked out" car—that is, a car without any lights on—which, in his experience, can be indicative of a stolen vehicle or involvement in criminal activity. Farmer followed defendant more closely so that he could check the license plate. Defendant then abruptly pulled over to the curb without being signaled to do so. Farmer ran the license plate and discovered that the car's registration had expired. Farmer parked, activated his overhead lights, and approached the vehicle on foot.

Farmer testified that he had conducted hundreds of stops, and, in his experience, "that initial contact with the driver walking up to a vehicle especially at night and under the circumstances I described" is "the most tense."

Farmer was "cautious" as he approached defendant's car, which appeared to be turned off. His past experience with traffic stops included "frequent" instances of people taking off by car or on foot to elude law enforcement, as well as "a lot" of instances of people "attempting to assault [police officers]or fighting or either trying to ditch contraband or hide contraband to include firearm and stuff." It is "extremely dangerous and unsafe" for a person to flee in their car, in Farmer's experience. Farmer has seen other people actually struck or nearly stuck in such situations, and Farmer himself has "almost [been] hit by a car" in the past.

On this specific instance, as he approached, he could see defendant engage in "rapid, furtive movements [as if he was] accessing something or concealing something." Then, as Farmer "walked up," defendant "abruptly dipped his head forward," such that he was leaning over the steering wheel and ignition area, and Farmer "immediately was concerned that [defendant] was about to activate the vehicle and take off." Farmer's "immediate action" to try to prevent that situation was to open the driver's door. He did not give any orders before doing so, because "it was a tense, rapidly evolving event from what [he] was seeing inside the vehicle," and he knew that "it takes a split second for somebody to turn on a vehicle and take off[.]" Defendant responded by immediately sitting up and removing his hands from the ignition area and stating that he was just trying to turn off the car. (Farmer believed the car was already off, so he found that statement to be "weird"). With defendant's hands away from the ignition—and the perceived safety risk thus dissipated—Farmer began a "basic traffic investigation."

In the course of the stop, Farmer requested and obtained consent from defendant to search the car.[1] Farmer seized a firearm that he found in the pocket of the driver's side door. At that point, defendant was not in handcuffs, but Farmer advised him of his *Miranda* rights based on the unlawful possession of a firearm. He later arrested defendant for felon in possession of a firearm and unlawful possession of a firearm.

---

[1] Defendant argues that his consent was involuntary, but we need not reach that issue given our holding on the officer-safety exception.

A grand jury indicted defendant for felon in possession of a firearm and unlawful possession of a firearm. Defendant filed a motion to suppress evidence, asserting that Deputy Farmer violated his rights under Article I, section 9, of the Oregon Constitution by committing an unlawful warrantless search when Farmer opened his car door. Defendant also demurred to the felon in possession charge, arguing that ORS 166.270(1) is unconstitutional as applied to defendant, as his predicate conviction was for a nonviolent felony, and there is no historical tradition in disarming nonviolent felons.

The trial court denied defendant's motion to suppress, concluding that the initial search was justified by the officer-safety exception:

> "THE COURT:   "[F]or the initial search, *** the totality of the circumstances is reasonable suspicion and []what Officer Farmer testified that both his experience, the movement, the area, the time of day, and the no lights, and the moving to the curb is enough for the proper opening the door and especially the—it looked like [defendant] might be trying to restart the car."

The trial court denied defendant's demurrer, relying on *State v. Parras*, 326 Or App 246, 531 P3d 711 (2023), *rev den*, 371 Or 511 (2023), *rev den*, 372 Or 763 (2024), as controlling.

Defendant entered a conditional guilty plea to both counts, reserving in writing his right to challenge the suppression and demurrer rulings on appeal.

## MOTION TO SUPPRESS

Defendant first assigns error to the denial of his motion to suppress. Our review is for legal error. *State v. Miller*, 267 Or App 382, 383, 340 P3d 740 (2014) ("We review the trial court's denial of a motion to suppress for legal error."). Defendant contends that the state failed to prove that Farmer's act of opening the driver's side door—which led to the discovery of the firearm—was justified by the officer-safety exception to the warrant requirement. The state defends the court's ruling.

Under Article I, section 9, of the Oregon Constitution, warrantless searches are *per se* unreasonable unless they

fall within one of the "specifically established and well-delineated exceptions" to the warrant requirement. *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983). The officer-safety exception is one such recognized exception. That exception allows an officer to "take reasonable steps to protect himself or others if, during the course of a lawful encounter with a citizen, the officer develops a reasonable suspicion, based on specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present." *State v. Bates*, 304 Or 519, 524, 747 P2d 991 (1987).

The state must prove three elements for the officer-safety exception to apply: (1) that the officer acted during a lawful encounter; (2) that the officer developed an objectively reasonable suspicion that the individual posed an immediate threat of serious physical injury; and (3) that the protective measures taken were objectively reasonable. *State v. Rodriguez-Perez*, 262 Or App 206, 212, 325 P3d 39 (2014). Whether an officer's concern is objectively reasonable depends on the totality of the circumstances as they appeared to the officer at the time. *Bates*, 304 Or at 563.

As we have previously explained, "[t]he officer-safety doctrine requires a careful balance of 'the individual's constitutional right[s]'" and "an officer's right to take reasonable safety measures.'" *State v. Bailey*, 307 Or App 782, 789-90, 479 P3d 304 (2020) (quoting *State v. Davis*, 282 Or App 660, 667, 385 P3d 1253 (2016)). We recognize that police officers "in the field frequently must make life-or-death decisions in a matter of seconds," and "[a]n officer must be allowed considerable latitude to take safety precautions in such situations." *Bates*, 304 Or at 524. To that end, "it is not our function to uncharitably second-guess an officer's judgment." *Bailey*, 307 Or App at 789-90 (internal quotation marks omitted). At the same time, we must bear in mind that [t]he concept of reasonableness in this context is not biased in favor of the concerns of the police." *Id.* (Internal quotation marks omitted). "And, to maintain a proper balance, we evaluate an officer's expressed safety concerns through an objective lens, requiring reasonable suspicion to be based on facts specific to the particular person searched,

not on intuition or a generalized fear that the person may pose a threat to the officer's safety." *Id.* (Internal quotation marks omitted).

Defendant contends that the state failed to prove that Farmer developed an objectively reasonable suspicion that defendant posed an immediate threat of serious physical injury to him. The state disagrees, pointing to the fact that the stop took place after dark, that defendant was driving without any lights (what Farmer described as a "blacked out" car), that defendant pulled over to the curb "abruptly" without being directed to do so, that defendant's car registration was expired, that Farmer suspected the vehicle was stolen, that Farmer was alone, and that, as he approached the car, Farmer saw defendant make "rapid, furtive movements [as if he was] accessing something or concealing something potentially" and then "abruptly dip[] his head forward" over the ignition area in a way that caused Farmer concern that defendant "was about to activate the vehicle and take off."

We agree with defendant that the state failed to meet its burden of proof with respect to the objective reasonableness of Farmer's subjective safety concerns. That the stop occurred at night in a high-crime area and that the officer was alone are relevant circumstances but do not carry much weight on their own, at least in these circumstances. *See Bates*, 304 Or at 526 ("Neither the hour nor the 'high crime' nature of the area tells us whether this defendant is likely to be a criminal * * *.") (Emphasis in original.); *State v. Smith*, 277 Or App 298, 305, 373 P3d 1089, *rev den*, 360 Or 401(2016) ("[W]here a defendant cooperates with police, in the absence of any threatening behavior by the defendant, generalized safety concerns * * * are insufficient to justify an officer-safety search."). The blacked-out car, expired registration, and other circumstances may have provoked a more individualized suspicion that defendant was driving a stolen car or otherwise engaged in criminality, but a suspicion of criminal activity is different from officer-safety concerns. *See Bates*, 304 Or at 527 (observing that "the mere possibility that [the defendant] might have committed a crime" was not sufficient to establish an objectively reasonable officer safety concern). And, even if it was somewhat unusual

for defendant to pull to the curb as he did without waiting to see if Farmer was going to stop him, the state has not explained how defendant doing so raised the safety risk to Farmer in the ensuing stop.

We next consider defendant's furtive movements inside the car as Farmer approached on foot, which were consistent with defendant trying to access or conceal something. We have previously held that, because furtive movements in a vehicle may have many explanations, something more than furtive movements is necessary for the officer-safety exception to apply, such as disobedience of police instructions. *See State v. Nye*, 295 Or App 559, 564, 435 P3d 805 (2019) (describing prior case law as requiring furtive movements to be coupled with other alarming conduct—such as disobedience of a police instruction, reluctance to comply, or conduct inconsistent with police inquiry—for the officer-safety exception to apply); *Davis*, 282 Or App at 660 (holding that an officer's patdown search was unlawful, where the defendant made furtive movements inside his vehicle as the officer approached, refused to explain what was in his bulging pockets, and showed other signs of recent drug use and preparation to run).

Here, defendant's abrupt head-dipping was the "something more" from Farmer's perspective. Farmer's testimony makes clear that it was that movement that spurred his decision to pull open the door, because he was concerned that defendant might be "about to activate the vehicle and take off." The question is whether that was enough to trigger the officer-safety exception, even if everything up to that point was not.

On this record, we conclude that the state failed to prove that it was. That is because, on this record, the facts of the situation are simply too vague. Farmer generally described fleeing cars as "extremely dangerous and unsafe" to officers and others, and he relayed that he had personally seen others hit or nearly hit and had been nearly hit himself. However, he did not describe the specific risk that he perceived on this occasion, given the specific circumstances. There were no other vehicles in the area, according to Farmer, and apparently no other people either, so the risk

at issue was to Farmer himself. Yet the record is silent as to where exactly Farmer was relative to defendant's car when he saw defendant's head dip over the ignition and how that created an objectively reasonable safety risk that Farmer would be struck if defendant took off at that point. Merely wanting to prevent defendant from taking off would not give rise to the officer-safety exception. *See State v. Whitlock,* 334 Or App 107, 113, 554 P3d 825 (2024) ("Even if [the] defendant's behavior led to the officer fearing that [the] defendant might flee 'or otherwise frustrate' investigation efforts, those concerns do not equate with a threat of serious physical injury to the officer." (Quoting *Baily*, 307 Or App at 788.)).

The state bore the burden of proof. Because the state failed to prove that Farmer developed an objectively reasonable suspicion that defendant posed an immediate threat of serious physical injury, the trial court erred in denying defendant's motion to suppress based on the officer-safety exception to the warrant requirement.

## DEMURRER

Next, defendant argues that the trial court erred in denying his constitutional demurrer. The grand jury charged defendant with unlawful possession of a firearm and felon in possession of a firearm (based on his prior conviction for UUV). Defendant demurred, arguing that while his predicate conviction of UUV may be a felony under Oregon law, it is not akin to a felony under common law, as there is no historical tradition of disarming "misdemeanants." Relying on *State v. Parras*, in which we upheld the application of ORS 166.270(1) against a defendant with prior felony drug convictions, the trial court denied the demurrer. Defendant now appeals the denial of his demurrer, arguing that *Parras* is either distinguishable or was wrongly decided.

Whether a statute violates the Second Amendment is a question of law. *State v. Shelnutt*, 309 Or App 474, 483 P3d 53, *rev den*, 368 Or 206 (2021). This court reviews the denial of a demurrer for errors of law, considering only the information appearing on the face of the charging instrument. *State v. Woodall*, 259 Or App 67, 69, 313 P3d 298 (2013).

In *District of Columbia v. Heller*, 554 US 570, 128 S Ct 2783, 171 L Ed 2d 637 (2008), the United States Supreme Court held that the Second Amendment protects an individual's right to possess firearms for self-defense. After *Heller*, courts across the country employed a two-part analysis to determine whether firearm prohibitions survived a Second Amendment challenge. That framework was later modified in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 US 1, 142 S Ct 2111, 213 L Ed 2d 387 (2022). After *Bruen*, a restriction on firearm possession is constitutional only if it is consistent with the nation's historical tradition of firearm regulation. In *Parras*, we upheld the application of ORS 166.270(1), Oregon's felon-in-possession statute, against a defendant with prior felony drug convictions, concluding that the statute did not violate the Second Amendment as construed in *Bruen*. *Parras*, 326 Or App at 257. We explained:

> "The weight of historical evidence shows that it was understood that individuals could be divested of Second Amendment protections if they broke the social contract of being a virtuous citizen by committing a serious crime. While it may be true that prohibitions on the possession of firearms by people convicted of felonies did not exist at the time of the framing of the Second Amendment, the concept that those who committed serious crimes were historically not entitled to Second Amendment protections did exist at the time of the framing. We thus conclude that ORS 166.270 is consistent with 'this Nation's historical tradition of firearm regulation.'"

*Id.* (quoting *Bruen*, 597 US at 2126). The defendant in *Parras* argued that his prior convictions—manufacture and possession of methamphetamine—were nonviolent, and thus insufficient to permanently disarm him under the Second Amendment. 326 Or App at 251. We disagreed, explaining that there was "little historical evidence that any differentiation was made between those who committed serious violent versus nonviolent offenses with respect to Second Amendment protections." *Id.* at 258.

Here, defendant contends that *Parras* is distinguishable because UUV is not as serious or violent as the offenses in *Parras*. Defendant argues that, in an as-applied challenge, his UUV conviction does not provide a sufficient basis for denying him his rights under the Second

Amendment. The state argues that defendant's argument has no merit because, in *Parras,* this court necessarily assumed that whether a crime is sufficiently "serious" is an issue to be decided by the legislature, which classifies criminal offenses. We agree with the state that *Parras* is both controlling and correct. Defendant also argues that there is no historical evidence supporting an American tradition of permanently disarming individuals for UUV or similar "joyriding" statutes. The state contends that the offense of UUV certainly can be committed in a manner that would have constituted felonious larceny under the common law. We agree with the state's reasoning and conclude that while there may be no historical evidence of disarming individuals with UUV convictions, that is only because automobiles did not exist at the time of the Second Amendment's ratification. In *United States v. Rahimi*, 602 US 680, 144 S Ct 1889, 219 L Ed 2d 351 (2024), the United States Supreme Court explained that "when a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass * * * but it need not be a 'dead ringer' or a 'historical twin.'" (Internal quotation marks omitted.). We conclude that UUV is closely analogous to well-established historical offenses including larceny, horse rustling, or trespass to chattels. Defendant even acknowledges that those crimes could have been prosecuted at common law as felonies. Accordingly, we affirm the trial court's denial of defendant's constitutional demurrer to Count 1.

Reversed and remanded.